Annabelle LIPSETT, Plaintiff,

v.

UNIVERSITY OF PUERTO RICO; Norman Maldonado, individually and as Chancellor of the Medical Science Campus of the University of Puerto Rico; Pedro Juan Santiago-Borrero, individually and in his capacity as Dean of the School of Medicine of the University of Puerto Rico; Jose R. Gonzalez-Inclan, individually and in his capacity as Acting Director of the Department of Surgery and as Acting Director of the Surgery Residency Training Program; Gumersindo Blanco, individually and in his capacity as Director of the Department of Surgery and Chairman of the University of Puerto Rico and Affiliated Hospitals Residency Training Program; Ernesto Rive-Mora, individually and in his capacity as Director of the Training Program of the San Juan Veterans Administration Hospital Charles C. Freeman, Center Director of the San Juan Veteran's Administration; James G. Martin, in his capacity as Director of the United States Veterans Administration, Defendants.

No. Civ. 83–1516CC.

United States District Court, D. Puerto Rico.

June 12, 1986.

Judith Berkan, Santurce, P.R., Esther Vicente, Rio Piedras, P.R., for plaintiff.

Edgardo Colón-Arrarás, Office of the Attorney General, San Juan, P.R., James D. Noel, III, Ledesma, Palou & Miranda, Francisco A. Besosa, Asst. U.S. Atty., Daniel F. López-Romo, U.S. Atty., Hato Rey, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is an action for damages as well as declaratory and injunctive relief brought pursuant to the Equal Protection and Due Process clauses of the Constitution of the United States, the civil rights legislation, the Constitution of Puerto Rico and several Puerto Rico laws.[1] Plaintiff seeks a declaration of illegality of certain allegedly sexually discriminatory practices used against her while she attended the University of Puerto Rico's School of Medicine Surgery Residency Program and reinstatement to that program so that she may complete it free from such practices. Upon ruling on motions to dismiss we stated earlier that plaintiff's action could not be dismissed on the pleadings, but that many of the claims as to some of the defendants would probably not survive a motion for summary judgment in view of their conclusory nature. *See Lipsett v. University of Puerto Rico,* 576 F.Supp. 1217, 1223 (D.P.R.1983). We also warned plaintiff that even those pleadings which contained some factual data failed to link each of the numerous defendants to a situation of potential liability. Plaintiff's response was to leave most allegations intact and add at the end that the defendants were jointly liable because they "at all times and regarding all matters

---

1. Specifically, 42 U.S.C. § 1983 and 20 U.S.C. § 1681 (Title IX), Article II Sections 1 and 7 of the Constitution of the Commonwealth of Puerto Rico, *P.R. Laws Ann.,* title 31 Section 5141, title 32 Section 3524, title 29 Section 146 and the "provisions of the Civil Code of Puerto Rico of 1903 concerning the specific performance of obligations arising under a contract."

complained of herein had knowledge or should have had knowledge of the events" and because they "participated in the proceedings leading to plaintiff's dismissal." The amended-amended complaint of March 30, 1984 paragraphs 59(a) and 59(b).[2] However, professors and officials of the University of Puerto Rico Medical Sciences Campus and School of Medicine, sued in their individual capacity (UPR officials),[3] took up the Court's lead on the weakness of some of the pleadings and requested partial dismissal in extensive, well-documented motions for summary judgment which plaintiff has opposed in equally extensive and documented writings and replies.[4] The officials from the Veterans Administration, the original defendants whom the court was referring to when suggesting that certain pleadings would not withstand a motion for summary judgment, have not filed any dispositive pretrial motions.[5]

After a painstaking examination of the documents, depositions and motions which comprise this four volume file and which reveals a disarrayed group of events covering a three year period and involving a multitude of individuals and situations, we have finally been able to flesh out the particulars of plaintiff's much clamored constitutional claim. The claim is divided into two parts: the first is based on sex discriminatory practices within the UPR Surgery Residency Program and the other deals with an alleged lack of due process in her evaluation. Upon examining the particular factual basis on which these claims rest, we find that there is no controversy requiring jury adjudication, at least, not as to the defendant U.P.R. officials. Although the record contains instances of what would appear to be, under the favorable inferences standard, adverse conduct and unequal treatment prompted by sexually discriminatory motives, there is a noticeable absence of the necessary factual basis to link these instances and attitudes to the possible scope of liability of U.P.R. officials.

The U.P.R. officials sued in their official and individual capacity are Dr. Norman Maldonado, Chancellor of the Medical Science Campus of the University of Puerto Rico; Dr. Pedro Juan Santiago-Borrero, Dean of the Medical Science Campus of the

2. Plaintiff's additional contribution to the court's efforts to accelerate the pace of the proceeding and get to the heart of what was originally deemed an urgent case, requiring the emergency relief of a temporary restraining order, was to include Secretary of Health Jaime Rivera-Dueño as a defendant, although the action against him had been dismissed since August 30, 1983, with her acquiescence. Since there is no apparent reason for reinstating the claim against him after a dismissal and given plaintiff's inaction as to this defendant since his inclusion in the amended-amended complaint of March 30, 1984, we consider his inclusion an error and shall strike all references to him in the amended-amended complaint.

3. The University of Puerto Rico (UPR) also moved for summary judgment in the original motion of October 1983. *See* note *infra.*

4. The many amendments that the complaint has undergone as a result of plaintiff's attempts to present a cognizable set of pleadings triggered the filing of two motions for summary judgment and their oppositions. The original motion for summary judgment of the UPR and its officials was filed in October 1983 and plaintiff's opposition in December 1983. Defendants' second set of motions for summary judgment were directed at plaintiff's amended-amended complaint and were filed on October 24 and November 7, 1984 and opposed on January 21, 1985. To compound matters, plaintiff's lengthy and documented opposition to the second motion for summary judgment refers to and *incorporates* her previous 73-page, extensively documented opposition filed in December 1983 which comprises almost an entire volume of this case even though most of its contents are repetitious. It would have been more helpful to the court if plaintiff had consolidated all her arguments and exhibits into a single opposition. This works to her detriment for it has only resulted in delaying the final resolution of the merits of her claim.

5. There is a discovery motion by these defendants which is still pending. It concerns a series of questions related to plaintiff's intimate life which the court ordered that these defendants file in a sealed envelope to determine if these questions could be asked. The federal defendants filed such sealed envelope. The court will issue a ruling on this matter shortly hereafter and will determine whether additional discovery will be permitted as well as the filing of any other pretrial dispositive motions by these defendants.

University of Puerto Rico; Dr. José R. González-Inclán, Acting Director of the Department of Surgery and Acting Director of the University of Puerto Rico and Affiliated Hospitals Surgery Residency Training Program and Dr. Gumersindo Blanco, Director of the Department of Surgery and Chairman of the University of Puerto Rico and Affiliated Hospitals Residency Training Program. The Surgery Residency Program is a five year learning-working internship where qualified doctors are hired on a yearly basis, in conjunction with the Puerto Rico Department of Health, to perform supervised surgery. During their residency, the doctors are evaluated every three months by their professors and perform under the guidance and direct supervision of their immediate superiors, those residents who have reached a higher position in the program's five level hierarchy. The program's residency positions are pyramidal, that is, at the highest level of proficiency, usually the fifth year of residency,[6] there are less openings than at the lowest level. There is hard competition for these progressively limited spaces.

Plaintiff entered the Program as a first year intern in July 1980, after having completed her medical studies at the Caribbean School of Medicine in Cayey, a private college. She was promoted to her second year of surgery residency in the summer of 1981. During this second year, in November 11, 1981, she had an incident with two senior residents which was brought to the faculty's attention. As a result of that incident, she was placed on probation during the first part of 1982 and was transferred to the Veteran's Hospital, an affiliated hospital of the Program. At the end of this period, the faculty received a complaint from two senior residents who had worked with her at the Veteran's Hospital rotation. The faculty, which two weeks before receiving the formal complaint had decided to promote her to the third year level, considered this complaint and determined that plaintiff would be allowed to complete her

third year of residency at the Program but that she would not be promoted to the fourth year. She was so informed and advised of her rights to seek reconsideration within the procedural scheme of the Program. On October 22, 1982, already into her third year, plaintiff requested a reconsideration hearing before the faculty. After holding the hearing in December 1982, the faculty voted against reconsidering their prior decision and she was notified. She continued to pursue the Program's administrative remedies, and, on January 24, 1983, requested that a special appeals committee review her case. During April of that year, the special appeals committee was formed and reviewed her case. This committee decided to affirm the surgery faculty's decision and so notified her on May 16, 1983. On June 30, 1983 she filed the instant complaint.

Plaintiff complains in general terms of a pervasive sexist attitude among the mostly male residents of the program, the faculty and society. She argues that the prevalent view is that women do not have what it takes to be surgeons, meaning certain traits, such as: "aggressiveness, dominance, endurance, perseverance, cynicism, compulsiveness, memory for facts and details, manual ability and interest in handling tools and machines," which society has generally attributed to males. Translating this into specifics which the court can handle, plaintiff claims that, on several undated occasions at the beginning of her internship, some male senior residents expressed to her and to other female surgery residents their sexist attitudes by stating their belief that surgery was no place for a woman. She also points to the male residents' constant reference to sex by describing their sexual adventures, making sexual jokes, giving nicknames to both male and female residents, some of which had sexual connotations, and placing pin-ups of nude women on the walls of the male residents rest facilities in one of the affiliated hospi-

---

**6.** Normally the residents are promoted to a higher level on a yearly basis. However, a resident may be required to perform on a lower level for an additional period of time, depending on the result of the evaluation.

tals where sometimes all residents had to meet or go to pick up their food. In one of the depositions on record, Dr. Karin Susan Bensen, a female resident who attended the Program during the academic year 1982–83 and who was not promoted to her second year of residency, mentioned an incident where she and plaintiff decided to transfer a young and pretty patient from the intensive care unit because the patient was lying naked on a bed at that unit and was being visited four or five times a day by various male residents, presumably to look at her body. Plaintiff also makes general reference to the male residents' efforts to date female residents, staff members and even patients and how those female residents who rejected their advances were unfairly treated. There is also reference to certain informal meetings at a pizzeria where some of the male residents would get together and discuss their cases. According to plaintiff's theory, this affected her opportunities for advancement within the Program because these social meetings, which presumably were foreclosed to female residents, assumed the character of quasi-official meetings since male junior residents had an additional opportunity to review and discuss their cases with their male seniors. In addition, plaintiff charges that other female residents, such as Dr. Bensen and herself, perceived how they were given harder tasks, held to tougher tests and reprimanded for the slightest errors by male residents to see if they could stand the pressure.

With respect to specific incidents of sexually motivated discriminatory conduct, plaintiff refers to the November 11, 1981 incident. As explained in the depositions, this incident had to do with plaintiff abandoning her emergency ward duties and leaving hospital premises without obtaining prior authorization. This was prompted by a heated discussion with a senior resident and with the chief resident. The senior resident had assigned her duties which she questioned as improper for a second year level resident. The senior resident, displeased by her challenging his authority, told her she would be assigned first year tasks for thirty days. Immediately thereafter, plaintiff complained of this treatment to the chief resident but this resident, who had allegedly told her earlier during her residency that he was out to get her and eliminate women from the program, backed the senior resident and threatened plaintiff with assigning her first year tasks for the rest of the year if she continued to challenge authority. The chief resident reportedly warned plaintiff that if she complained to the faculty she would regret it. This apparently took place in front of patients and staff and left plaintiff in such an emotionally disturbed state that she abandoned hospital premises and drove to a relative's house. She called defendant González-Inclán to complain about the residents' abusive behavior and Dr. González-Inclán excused her from duty on account of the emotional state that she was in. The matter was subsequently investigated by Dr. González-Inclán who heard the explanations of all the residents involved, including plaintiff. The faculty followed his recommendation not to separate plaintiff from the Program since the senior residents could also be blamed for the way they had exercised their authority. Plaintiff's abandonment of duties was, nevertheless, reprimanded and she was placed on probation for the next six months of her second year. She was also assigned to rotate at the Veteran's Hospital where she would not be in contact with the senior residents involved in the November 1981 incident. These residents, however, decided to pursue the matter further and in December 1981, after calling a residents' meeting, sent a letter-complaint to the faculty mentioning other instances of dereliction of duty by plaintiff and requesting that she be separated from the Program. Six members of the faculty met with some residents to discuss this and decided to submit the matter to a full staff meeting. The faculty concluded that the earlier decision not to suspend plaintiff but to place her on probation would not be altered, despite these additional complaints.

During the month of December 1981 plaintiff met with Dr. Blanco to discuss the November incident and, for the first time, mentioned that the hostility of the two residents toward her could have been motivated by the fact that she was not the typically submissive woman. She also told Dr. Blanco that some male residents had made sexual advances to her and spoke of what she calls the "dynamics" of the Program or, as stated in her deposition, the general feeling among some male residents that women are considered unsuitable as surgeons. She did not go into specifics nor did she mention any names to Dr. Blanco. She also told him that in the past she had taken an overdose of tranquilizers and had to be hospitalized for two days. Dr. Blanco told her he would transfer her to Veteran's Hospital during her probation, where she would not be in contact with the two residents involved in the November incident, and recommended that she see a psychiatrist who was a friend of his.

The other specific incident related by plaintiff where she made some sort of approach to the faculty, or staff regarding this allegedly sexual harassment was during her six-month probation period. While rotating at the Veteran's Hospital, she complained to the attending faculty members, Dr. Hernán Méndez and Dr. Calimano (not defendants in this case) that Dr. Orlando Torres, her senior resident, could not accept criticism from her and that this resident was being assigned too many operations. Dr. Méndez advised her that she had to obey her senior resident's orders no matter how unsound they appeared to her for that was the way the system worked but that he would talk to Dr. Torres. Dr.

Calimano told her not to worry, that he would assign her more operations. Following this rotation, the faculty again received complaints about plaintiff's performance and her promotion to third year was then reconsidered. At a meeting during June 1982, plaintiff voiced her concern regarding her senior resident's incompetence. Thereafter, upon seeking reconsideration, she again stated her complaints in a written Request for Reconsideration which she read at the reconsideration hearing and in the letter seeking reconsideration. She also stated her complaints formally in a writ of appeal presented to the special appeals committee. Surprisingly, the only document which mentions anything related to sex discrimination, in a conclusory manner and without reference to any of the specific instances plaintiff has referred to in this case, is the April 1983 writ of appeal. It is there alleged that during her first years of residency a group of senior residents, again unidentified, had sought to harass her, not sexually, and obstruct her internship just because she was a competent female resident.[7]

The other incident of alleged sexual harassment involves Dr. Ernesto Rivé-Mora, a faculty member, and an attending physician at Veteran's Hospital. Plaintiff claims that when she rotated at Veteran's Hospital during her first year of internship she was apprehensive because Dr. Rivé-Mora took special interest in her. Dr. Rivé-Mora allegedly commented to plaintiff about the beauty of her hair, body or legs, invited her once for a drink, and, on several occasions, came to the hospital when she was alone on night duty.[8] In view of the

---

7. The translation reads:
 In spite of this good performance from the beginning, I was aware of the fact from conversations as well as from situations in which I found myself with a small group of residents (some of them no longer in the program at this time due to having concluded their training, others in their last year), who devoted themselves to harass me and obstruct my work for the sole purpose of having me expelled from the residency. This due to my being a competent female resident since, as we all know, the surgery field has been practically forbidden to women until very recently.

8. We make no pronouncement on whether these "piropos," invitation to drink or visits to the hospital when she was assigned night duty are true, or for that matter, sufficient to constitute illegal sex harassment since this defendant has made no request on such matters. Since this case is replete with allegations as to improper conduct of many persons whose private lives may be affected by a mistaken interpretation of our opinion, we must emphasize that all allega-

rumors she had heard about Dr. Rivé-Mora's romances, she sensed this conduct had sexual connotations and that if she was not nice to him he would not treat her well. During her first rotation in late 1980 she returned smiles and was "nice" to Dr. Rivé-Mora and got to operate a lot during her first year when normally residents at that level do not operate. During her second rotation at Veteran's Hospital, in the first part of 1982 when she was placed on probation, she did not respond to Dr. Rivé-Mora's comments with smiles and she was not "nice" to him. His attitude then changed in that he would be evasive and tell her to state in writing every complaint she had of her fellow residents' inadequacies. She did not report her impression of Dr. Rivé-Mora to any member of the faculty or to any of the defendants, only to her friend and female senior resident, Dr. Zenaida Méndez.

Finally, plaintiff refers to the "common knowledge" that women are discriminated against in professions such as surgery and to Dr. Blanco's comment, overheard by Dr. Zenaida Méndez, on how he understands this hardship, the unequal physical facilities in one of the affiliated hospitals where the residents practice, the stricter standard of evaluation and sanctions applied to women residents and the gross disproportion of women to men that have completed the Program in the last twenty-two years, as signs that should have revealed to U.P.R. officials the presence of pervasive sex discrimination and harassment in their surgery program. However, she again falls short of establishing the factual support for the importance and weight she attributes to these things. There is no reference to a specific instance where a male resident received a better treatment or a better evaluation than a female resident in a *similar* situation. There is evidence in the record of other male residents who received negative evaluations based on deficiencies associated with their personality

and adaptation to the Program's authoritarian structure of command. The fact that plaintiff received good and outstanding evaluations from many of the faculty members on most of her surgeon skills, except for those having to do with her relationships with residents, further undermines her conclusory allegations of unequal evaluations. But, more important to the precise scope of liability examined herein, aside from the November 1981 incident, there is no indication of plaintiff ever calling to defendants' attention any specific and significant instance of discriminatory evaluations or sanctions. She refers only to an instance where a senior resident,[9] who was allegedly drunk on duty and had deliberately changed some medical records, was reported by Chief Resident Zenaida Méndez and when directed to put it in writing she withdrew the complaint. It should be noted, however, that accusing a resident of being drunk while on duty and altering records is a very serious matter which could not only ruin the particular doctor's reputation but could trigger a multitude of malpractice suits against the U.P.R. officials, considering all the cases this senior resident could have handled. And it is important to note that, when plaintiff abandoned her duty in the November 1981 incident, the objecting residents stated their complaints in writing and followed through with their objections to plaintiff's conduct. There was nothing preventing plaintiff or Dr. Zenaida Méndez from following through with their objections, setting them forth in writing or reporting the incidents they claim the male residents got away with.

The claim that facilities were unequal rests on the fact that the resting quarters of female residents were smaller, without color television or an emergency bell, their dressing rooms were farther from the operating room than the men's and the phone did not always work. Defendants state

tions of fact are taken as true for purposes of this analysis only and are not to be considered by anyone as having been proved to be true.

9. This was allegedly the same individual who prompted the November 1981 incident by assigning plaintiff the tasks she thought improper.

that these facilities, which refer to only one of the hospitals affiliated to the Program, are under the control of the Department of Health, not a party to this action. There is no indication that these "inequities" were ever brought to the attention of any of the defendant U.P.R. officials.[10] Likewise, the disproportion of women residents to male residents who have completed the Program in the last 22 years, 5 females to 68 males, is plagued with so many variables that it cannot be considered the "clear signal of discrimination" suggested by plaintiff. These officials could have reasonably thought that the disproportion was due to the small number of women who attend the Program or to the equally less number of women doctors who apply to the surgery specialization residency or to the generally lesser number of women who choose to study medicine. Such disproportion is no clear sign that sex discrimination practices were rampant in the Program.

The most revealing document, however, on whether there was a pervasive atmosphere of discrimination that defendant public officials could not help but notice is the deposition of female co-resident Zenaida Méndez. Dr. Méndez completed the surgery training program successfully and was named Chief Resident during part of her last year. She was in a higher level when plaintiff entered and some of her co-residents were part of the handful who were openly hostile to Lipsett. Dr. Méndez is knowledgeable of plaintiff's period of internship and of the workings of the Program.[11] She clarified the affidavit subscribed by her which was attached to the original complaint in which she indicated that there was a pervasive atmosphere of sex discrimination in the Program, to state that, with respect to her, there was really only one incident of harassment. The resident involved in this incident was the one with the alleged drinking problem and the

harassment consisted of his trying to kiss her at the resting facilities while drunk. Dr. Méndez did not report this incident to the faculty. She mentioned that during the years she spent at the program she was not subjected to any other harassment of this nature and that no one at the Program ever questioned her ability to perform because of her sex nor placed her in a position of having to prove herself in a way that her male counterparts did not have to. When questioned about the faculty members and some of the U.P.R. officials, she had nothing but praise for them. She specifically described Dr. Blanco and Dr. González-Inclán defendants as excellent educators and administrators and said that she received cooperation from the latter every time she requested it. With respect to Dr. Lipsett's conduct at the Program, Dr. Méndez confirmed the recurring complaints by other residents and the faculty that she had the habit of questioning authority. Dr. Méndez stated that plaintiff would object or question the instructions given and procedures followed by her senior residents in a manner that annoyed them. She understood that it was mainly Lipsett's lack of tact that angered these residents and stated that "Dr. Lipsett has a somewhat strong personality and ... she did not like to follow the traditional line of bowing to the one who had the greater authority." Dr. Méndez could not say whether a male resident who criticized his superior in the manner used by plaintiff would be sanctioned less harshly, since she did not know of any resident criticizing the superior resident in the same, direct manner that plaintiff did. It is also revealing that Dr. Méndez considered the nude posters in the men's resting quarters as sexually humiliating, yet she never complained to the faculty, not even when she was chief resident. She does not recall whether plaintiff ever complained to her of more

**10.** Dr. Karin Bensen said that she discussed the matter of the phone with Chief Resident Zenaida Méndez and that Dr. Méndez told her she had "reported" the phone many times but that "what could you expect?" They fail to indicate, however, to whom they reported this.

**11.** Contrary to Dr. Bensen who only attended one year 1982–83 the last year of plaintiff when the staff had already decided not to promote plaintiff.

stringent demands because she was a woman. She spoke of the tremendous hardship confronted by residents in general and of the pressure of life-death situations encountered in the surgery residency. Her deposition reveals that there were personality problems among the residents, as was the case with the resident who harassed her and who was also involved in the November 1981 incident, as well as romances, as was the case of Dr. Lipsett's intimate relationship with two married residents during her residency. Overall, Dr. Méndez' deposition did not reveal a picture of blatant discriminatory practices and harassment but rather of instances of friction and personality clashes arising from the competitive and stressful atmosphere of a surgery program.

 From this amalgamation of sometimes disconnected facts, rumors, perceptions and assumptions, plaintiff is trying to find her way to the jury and to pin liability on defendants in their supervisory capacity. She relies heavily on the procedural protections afforded the opposing party in a summary judgment procedure in order to safeguard the right to have one's "day in court" and on the fact that his is essentially a civil rights case involving a question of motive, one typically unsuited for summary adjudication. Summary judgment is, of course, inappropriate when there are issues of fact on material controversies. Rule 56(c) Fed.R.Civ.P.; *see gen. First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) *and Hahn v. Sargent*, 523 F.2d 461 (1st Cir.1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The court must draw all reasonable inferences from the factual content supported by the record in favor of the opposing party, *id.* Due to the high standard that a party moving for summary judgment must meet, it is generally accepted that summary judgment may be inappropriate in cases where the central issue is related to motive or intent. *See Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (antitrust); *Mack v. Cape Elizabeth School Board*, 553

F.2d 720, 723 (1st Cir.1977) (civil rights). However, this does not mean that in any case where there is an issue as to someone's intent, however remote to the controversy, a party may simply oppose a Rule 56 motion by merely claiming that intent is in issue. Courts have repeatedly entertained and granted motions for summary judgment in cases where an issue as to motive, animus or intent was raised. *See Brown v. Trans-World Airlines, Inc.*, 746 F.2d 1354 (5th Cir.1984) (unfair representation case, issue on union's motivation in handling grievance solved summarily); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1110–12 (5th Cir.1979) (there is nothing in Rule 56 to suggest that it should not be applied equally to all types of actions); *Metge v. Baehler*, 577 F.Supp. 810, 824 (S.D.Iowa 1984), *aff'd. in part rev'd. in part* 762 F.2d 621 (8th Cir.1985) *cert. denied* — U.S. —, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986) (summary judgment granted on issue of knowledge in securities, "controlling person" liability case). The fact that the case deals with some important public interest litigation, such as the Civil Rights Act, is also no bar to summary adjudication if Rule 56's requirements are met. *See Singer v. Wadman*, 745 F.2d 606, 608–9 (10th Cir.1984) *cert. denied,* — U.S. —, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985) (summary judgment available in civil rights conspiracy case); *Victoria L. by Carol A. v. District School Bd.*, 741 F.2d 369, 373 (11th Cir.1984) (Rule 56 applied to Education of the Handicapped Act case); *Miller v. Solem*, 728 F.2d 1020, 1025–26 (8th Cir.1984) *cert. denied,* — U.S. —, 105 S.Ct. 145, 83 L.Ed.2d 84 (1985) (in prisoner civil rights case court rejected conclusory allegations as to knowledge of prison officials and dismissed summarily); *Warfield v. Adams*, 582 F.Supp. 111, 119 (S.D.Ind.1984) and cases cited at n. 11 (intent question in Title VII racial discrimination in employment case solved by summary judgment). In *Méndez v. Belton*, 739 F.2d 15 (1st Cir.1984), a race and sex discrimination civil rights case by a female doctor who alleged that the revocation of her hospital staff privileges was motivated by

the sexually discriminatory animus of defendant Dr. Robert Belton who had previously criticized her surgery practice, was dismissed summarily despite the presence of allegations of subjective intent. *Id.* at 20. *See also Hahn v. Sargent,* 523 F.2d 461, 468 (1st Cir.1975) *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). These cases indicate that, regardless of whether the allegations relate to constitutional claims or present issues of subjective intent, when confronted with a well-supported motion for summary judgment, the opposing party cannot rest on conclusory allegations on the alleged state of mind issues but must offer some indication that the requisite quantum of evidence needed for the claim to reach the jury can be produced. *Hahn,* 523 F.2d at 468. In other words, the party opposing a motion for summary judgment must present a proffer of evidence sufficient to establish that there exist genuine issues on material controversies of fact which, if established at trial , would entitle that party to prevail on the merits. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985 (1st Cir.1983). A "material controversy" is one which "affects the outcome of the litigation" *Hahn,* 523 F.2d at 464, or one which has some "legal significance" to the asserted claims. *Union Planters Nat. Leasing, Inc. v. Woods,* 687 F.2d 117 (5th Cir.) *reh. denied* 691 F.2d 502 (1982). Differences in the parties' versions of the facts do not preclude summary judgment if these differences are immaterial to the resolution of the case. *Singer v. Wadman,* 745 F.2d at 609. A "genuine" issue is one supported by substantial probative evidence in the record going beyond the allegations, *Hahn,* at 464; *see also First National Bank of Arizona,* 391 U.S. at 288–90, 88 S.Ct. at 1592–93, in the nature of facts and not conclusions, *id.,* or unsupported allegations of counsel, *Wade v. New York Tel. Co.,* 500 F.Supp. 1170 (D.N.Y.1980) *declined to follow Meiri v. Dacon,* 759 F.2d 989 (2d Cir. 1985), or the opposing party's own contradictions in the record, *Reisner v. General Motors Corp.,* 511 F.Supp. 1167 (D.N.Y.1981) *aff'd* 671 F.2d 91, *cert. denied,*

459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982), or the opposing party's subjective characterization of the alleged discriminator's motives or intent, *Fisher v. Flynn,* 598 F.2d 663, 665 (1st Cir.1979). The inferences to be made in favor of the opposing party are only those that may be reasonably drawn from the factual context in the record. *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942 (6th Cir.1983); *Bertrand v. International Mooring & Marine, Inc.,* 700 F.2d 240 (11th Cir.), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung,* 695 F.2d 1294 (11th Cir.1983); *Central Nat. Life Ins. Co. v. Fidelity & Deposit Co. of Maryland,* 626 F.2d 537 (7th Cir.1980); *General Chemicals, Inc. v. Exxon Chemical Co., USA,* 625 F.2d 1231 (5th Cir.1980). If from an agreed set of facts one finds that reasonable jurors could draw an inference determinative of the opposing party's claim, then summary judgment would be improper. *Taylor v. Gallagher,* 737 F.2d 134 (1st Cir.1984). As explained by the Fifth Circuit:

> Insofar as any weighing of inferences from given facts is permissible, the task of the court is not to weigh these against each other but rather to cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness, casting aside those which do not meet it and focusing solely on those which do.

*Am. Tel. & Tel. Co. v. Delta Communications Corp.,* 590 F.2d 100, 102 (5th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). An opposing party, however, cannot defeat a summary judgment motion by basing the alleged genuine issues on mere speculation or the building of inference upon inference *Barwick v. Celotex Corp.,* 736 F.2d 946 (4th Cir.1984). While plaintiff is "entitled to all favorable reasonable inferences supported by the record [she] is 'not entitled to build [her] case on the gossamer threads of whimsey, speculation and conjecture.'" *White v.*

*Hearst Corp.,* 669 F.2d 14, 19 (1st Cir.1982) *citing Manganaro v. Delaval Separator Co.,* 309 F.2d 389, 393 (1st Cir.1962).

In the present case there would have to be genuine issues supported by the record as to material facts concerning the U.P.R. officials' liability. With respect to the sex discrimination and harassment aspect of plaintiff's claim, these defendants' liability has been essentially cast on the knowledge they had or should have had of the incidents and of the alleged antics and on their inadequate response as supervisors of the Program rather than on their personal participation in acts of discrimination and harassment. The Supreme Court has rejected imposing civil rights liability strictly on the vicarious element of the respondeat superior theory. *See Monell v. Depart. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1978); *Voutour v. Vitale,* 761 F.2d 812, 819 (1st Cir.), *cert. denied* — U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). However, liability in this type of case may be imposed on non-participating, supervisor-type defendants if plaintiff can establish an "affirmative link" between those who participated personally in the alleged wrongdoing and the defendants who were not personally involved. *Vitale,* 761 F.2d at 820. To establish the "link" plaintiff would need to show that these U.P.R. officials somehow supported, acquiesced or encouraged the unruly residents' behavior by remaining impassive before complaints of such discriminatory and harassing conduct or by refusing to acknowledge and investigate a strikingly obvious pattern of sex discrimination and harassment, *see id.* at 820–823;[12] *see also Naughton v. Bevilacqua,* 605 F.2d 586, 589 (1st Cir.1979),[13] or that such discriminatory treatment was part of a policy sanctioned by them. *Bennett v. City of Slidell,* 728 F.2d 762, 767–68 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). However, the supervisory acts or omissions that allegedly sanctioned or condoned the residents' conduct, that is, the circumstances surrounding the "affirmative link" of liability, must reveal gross negligence or deliberate indifference. The Supreme Court has recently held that mere negligence or lack of due care by a

**12.** The affirmative link has been established in other situations by reference to the superiors' gross negligence in providing adequate training to the employees engaging in unlawful conduct. *Vitale,* at 820. Given the wrongdoing alleged in this case and the extremely attenuated causal relationship between such behavior and adequate training, the "lack of training" approach to establish the liability link is ruled out. In any event, plaintiff has not approached the problem on these grounds. *See also City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2433–35, 85 L.Ed.2d 791 (1985).

**13.** Within the context of prisoner civil rights cases, the First Circuit recently held that supervisory prison officials may be found liable even if they were ignorant of the specific incident at issue, if they had the power and duty to alleviate the widely known general conditions which led to the violation—the death of an epileptic pretrial detainee who was not provided adequate emergency treatment for his epilepsy. *Cristóbal Miranda v. Giménez-Muñoz,* 770 F.2d 255, 260–61 (1st Cir.1985). In *Cristóbal,* the court recognized that respondeat superior liability was inapposite to the civil rights arena but found that given the supervisors' power and duty to provide adequate medical treatment and the fact that the detainee's death did not represent a sporadic incident but was a reflection of a routinely defective system of prisoner medical treatment which was generally known to defendants, their deliberate indifference to remedy the widely known general situation was actionable, *id. Compare Kotska v. Hogg,* 560 F.2d 37, 40 n. 2 (1st Cir.1977). In the instant case, although plaintiff has not relied specifically on the *Cristóbal* ruling, there is no adequate support for the contention that U.P.R. officials were deliberately indifferent to the point of being held directly liable, even assuming they had the power and duty to free the Program from the type of sexually discriminatory and harassment attitudes complained of by plaintiff. First of all, as we shall further elaborate, the record does not support the proposition that there was a pervasive pattern of actions similar to the routinely defective system present in the *Cristóbal Miranda* situation. There is also insufficient evidence to establish that U.P.R. officials indeed failed to act, within the limits of what they were able to do, or for that matter, had to do anything given the silence, conclusoriness and vagueness of her approaches to U.P.R. officials before making the serious allegations she now makes against fellow residents.

state officer does not amount to a constitutional violation. *Daniels v. Williams*, — U.S. —, 106 S.Ct. 677, 90 L.Ed.2d — (1986); *Davidson v. Cannon*, — U.S. —, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *see also Williams v. City of Boston*, 784 F.2d 430, 434–35 (1st Cir.1986). With respect to defendant U.P.R.'s liability under Section 1983 and Title IX,[14] inasmuch as the U.P.R. officials defendants are the higher echelon representatives of the institution and the persons through which the U.P.R. would act as an entity, *see Pembaur v. City of Cincinnati*, — U.S. —, 106 S.Ct. 1292, 1296–98, 89 L.Ed.2d 452 (1986), the U.P.R.'s liability can also be couched in a manner similar to that of the officials, *see Moire v. Temple University School of Medicine*, 613 F.Supp. 1360, 1366 (E.D.Penn.1985) (educational institution recipient of federal funds may be found liable to the extent that it condoned or ratified any invidious discriminatory conduct); *see also Alexander v. Yale University*, 459 F.Supp. 1, 4 (D.Conn.), *aff'd* 631 F.2d 178 (2nd Cir.1980), and our analysis of the officials' liability is equally applicable to defendant U.P.R.

■ The specific factual allegations of this case refer to several incidents which were not reported to the U.P.R. officials who have been sued. Plaintiff, self-described as an outspoken woman, never felt the need to do so. The male residents' alleged harassing comments on the inadequacies of women surgeons, on sex, the nicknames, their childish antics, their nude pin-ups, the all-macho pizzeria club, the unequal treatment in evaluating women, the romances among the residents, including plaintiff's two relationships, and the less suitable facilities were never reported to the U.P.R. officials sued, although they were occurring since plaintiff started attending the Program in the summer of

1980. Even assuming that all these allegations were true, they fail to establish a sufficiently obvious and pervasive pattern of discrimination and harassment that would make the U.P.R. officials liable for not taking notice of these circumstances. It was only after the November 1981 incident, more than a year after plaintiff entered the Program and allegedly endured the sexually oppressive atmosphere without complaint, that she first approached the U.P.R. officials. Yet, even on this ocassion, she was not specific about the situation and did not mention any names to Dr. Blanco at the December 1981 meeting when she allegedly told him of the Program's "dynamics." Neither Dr. González nor Dr. Blanco, however, remained impassive. They heard her story, as well as the other residents' version,[15] met with the entire faculty to discuss the incident and voted on the matter. Although she had incurred in a serious dereliction of duty that could have cost lives and could reasonably have constituted grounds for a summary dismissal from the Program, she was placed on probation and allowed to continue the second half of her second year residency. During her probation she again complains to her "attendings," the Program staff members—not to the U.P.R. officials. Her complaints were not couched in terms of sex discrimination. They had to do with the Program's structure of authority and the assignment of cases to other residents. After these "attendings" expressed their views to her, she did not approach defendants Blanco and González to express her dissatisfaction, if any, with their explanations. She did not complain of Dr. Rivé-Mora's alleged previous advances when Dr. Blanco told her that during her probation she would rotate at the Veteran's Hospital, the affiliated hospital where she would again be in contact with Dr. Rivé-Mora. It

---

**14.** Defendant U.P.R. officials would not be proper defendants in the Title IX private action which is directed at curtailing sex discriminatory practices in educational institutions recipients of federal funds. 20 U.S.C. section 1681. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979); *Cannon v. Univ. of Health*

*Sciences/The Chic. Med.*, 710 F.2d 351, 356 (7th Cir.1983).

**15.** When Dr. González was first approached by plaintiff on the day of the incident, he acted upon her version and without listening to the other residents excused her from her duties.

is only at the end of her probationary period, when she is again confronted with charges of deficiencies by two residents who were not directly involved in the November 1981 incident, that she alleges, in very general terms, that she was being treated unfairly. Plaintiff failed to denounce the components of the pervasive atmosphere of discrimination she now avers in her complaint, even though her residency was at stake. Throughout the first semester of her last year, again, no complaints. Even her request for reconsideration lacks specifics that would enable U.P.R. officials to ascertain whether there existed a pervasive atmosphere in the Program that was affecting the evaluation and performance of women residents. In fact, a reading of her requests for reconsideration at that time reveals a situation involving a personal animosity campaign by a handful of senior residents, most of whom had already graduated and not a pervasive atmosphere or rampant sexist attitudes among all residents. We come now to her special appeal. This was her golden opportunity to express in detail, with supporting documentary and testimonial evidence, the multiple incidents reflecting the alleged sexist atmosphere in the Program. However, plaintiff again referred in very general terms to her plight.

It is important to note that we are not before an intimidated, high school student in a bureaucratic structure where access to supervisors may be indirectly curtailed. The situation involves an articulate adult and an intelligent professional in a graduate training program that had a limited number of students, where faculty and departmental heads are accessible and meet regularly with the residents. Under these circumstances, plaintiff's limited approaches to Dr. Blanco and Dr. González-Inclán are insufficient to support the contention that these defendants were aware that she was being sexually discriminated and harassed and that the program had a pervasive sexually oppressive atmosphere. The record is also insufficient to establish, as a reasonable inference, that U.P.R. officials knew or should have known that sex

discriminatory attitudes, to the extent of affecting the female residents' performance and evaluations, existed in the Program. Many of the matters forming part of the alleged sexually oppressive scenario are based on plaintiff's own perceptions of objectively innocuous acts or comments, *cf. Fisher v. Flynn*, 598 F.2d 663, 665 (1st Cir.1979) (court rejected allegations as "merely reflecting plaintiff's subjective characterization of defendants' motives and actions" in a sex discrimination in employment [Title VII] case), some refer to matters outside the U.P.R. officials' scope of authority and others rest on mere rumors and speculation which, to a certain extent, are illustrative of the usual interpersonal conflicts and relationships expected in the stressful and competitive, life-death environment of a surgery residency. Complaints of this type must be supported by more than vague generalizations. Those instances which could arguably be presented as evidence before a jury when, stripped of the rumors and subjective perceptions, reveal a very limited number of incidents, at times unrelated, with a few residents over a three year period. This is far from the pervasive and oppressive atmosphere that should have been apparent to U.P.R. officials and moved them to take action. Despite plaintiff's failure to grant importance to the effect of this atmosphere on her studies by denouncing it with sufficient specificity and at the earliest possible time before U.P.R. officials so that they could do something about it, she charges them for failing to perceive what she herself chose to disregard, although at the time there were means that she could have pursued. As soon as Dr. Blanco and Dr. González-Inclán were first placed on notice of her problems in the Program, they acted accordingly, given the circumstances and scarce information provided, and started an investigation. Dr. Maldonado and Dr. Santiago also considered her case and also investigated when the complaint reached their level. Whether the investigations conducted complied with the due process requirement will be discussed further on.

What is relevant to the present discussion is that when the officials were placed on notice they acted in accordance with the type of information that was provided [16] and that the sexual hostility and attitude perceived by plaintiff was never properly made known to them nor was it of such magnitude that ignoring it could be construed as deliberate indifference. As to these material facts, the record reveals that there is no substantial controversy. We sympathize with women and with the efforts of any minority to overcome crippling bias and to achieve success in areas from which they have traditionally been excluded. We must, however, act on data from which reasonable inferences can be drawn to ascertain the necessary subjective element that the law may at times require. Cf. *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir.1980) (in race discrimination employment Title VII suit employer cannot change personal beliefs of employees but can convey the message that racial harassment will not be tolerated).

We come now to plaintiff's due process claim. She contends that she was not given adequate notice of the charges, that U.P.R. officials did not follow the pertinent regulations, that she was not allowed the opportunity to cross-examine, that one of the members of the special appeals committee should not have been appointed, that Dr. Rivé-Mora's participation in the process as faculty member tainted the procedure, and generally, that the decision makers acted on their own discriminatory animus and sexist prejudice in deciding against her. In establishing the "property right" she was deprived of, plaintiff contends that since she was promoted to the third year residency level she was entitled to finish the program and become a surgeon for once a resident attains third year level the chances of completing the Program are practically assured.

The procedure relied on by the U.P.R. officials in evaluating plaintiff, the so-called "due process" rules, provide that, due to the pyramidal setting of the Program positions available, only a limited number of residents are promoted to the second and third year levels. These rules require that the residents be evaluated quarterly by the attending staff (faculty) of the service that he or she is rotating in at a given quarter and also by the senior resident assigned to that service. The residents are also evaluated by the Chief Resident, the Chief of Surgery and the Training Program Director regarding the resident's teaching activities. Their evaluation also rests, in part, on the Surgical In-Training Examination scores. All of this information is presented to the surgical staff for discussion and appropriate action is taken. The residents may be promoted, promoted conditionally or dismissed from the Program. Dismissal may be on disciplinary or academic grounds. The Training Program Director has to inform the resident personally of any unsatisfactory performance. The resident may then seek reconsideration from the faculty of any adverse decision regarding his/her performance within ninety days, with the option of presenting the case personally at a staff meeting where

> All the facts of the case will be reevaluated and a vote taken on possible alternative action. If the final decision is to dismiss the resident from the program, this decision can then be appealed to a special committee consisting of the Director of Graduate Medical Education, the Secretary of Health or his designate, the Dean of the Medical School, the Chairman of the Department of Surgery and the President of the Surgical Committee of Interns and Residents. The last member must be a resident in good standing. This committee will pass final judgment on the dismissal decision.

Exhibit 3, complaint filed June 30, 1983. The procedure established by the Program's internal rules goes from the informal faculty to resident encounter to the more formal special appeals independent

---

**16.** This can hardly be considered to be negligent conduct, much less, conduct equivalent to gross negligence.

committee evaluation. The U.P.R. officials acted as follows, pursuant to these rules.

When the November 1981 abandonment of duties incident was first brought to Dr. González-Inclán's attention by plaintiff, he acted based only on the information she gave and excused her that day from her duties. Later on, he investigated the matter more fully and after hearing both parties' versions, submitted the matter to the faculty. The faculty's decision was that she be placed on probation. It should be noted that, according to the internal rules, plaintiff could have sought reconsideration of this initial decision but did not do so. A group of residents sent a formal complaint to the faculty on December 2, 1981 listing specific instances of misconduct by plaintiff other than the incident just mentioned. The matter was discussed at a faculty meeting on December 3, 1981 and at a house staff (residents) meeting later that same day. At said meeting, Dr. Blanco explained to the residents the seriousness of the allegations and asked for comments from those who had personal knowledge of the incidents mentioned in the letter. The residents confirmed the times in which plaintiff was not available, even though she was on duty. Even Dr. Zenaida Méndez, who testified as to plaintiff's positive traits as a surgeon, mentioned that she had a strong personality and that she would frequently flaunt authority. Notwithstanding these additional complaints, the decision to place plaintiff on probation was not altered.

At the end of her period of probation, plaintiff was promoted to the third year. However, two weeks later the faculty received two formal complaints. In these letter-complaints, Drs. Juan O. Torres-Cartagena and Orlando Cuevas mentioned specific incidents of faulty performance by plaintiff during her period of probation, namely: the practice of assigning patients to her ward without consulting the senior residents in order to get more candidates for operations and then denying it to the senior resident, lateness in her rounds, absenteeism, failure to inform her superiors of the results of tests taken on her patients, deliberate disregard of specific instructions and norms on the admission of emergency patients in order to satisfy her own personal interests, and frequent friction with other residents working with her, especially her "juniors." These letters were discussed in a faculty meeting attended by plaintiff and Dr. Zenaida Méndez. Plaintiff was confronted with the complaints. She was asked to explain her side of the story and to provide her personal views and explanations. After doing so, she was excused. The faculty discussed her case but did not reach a decision on the matter. Dr. Blanco suggested that he interview the residents involved and call a meeting to decide. A week later, on July 8, 1982, the staff met again. Dr. Blanco reported that Dr. Cuevas remained firm in his complaints and request that plaintiff be separated from the program. The faculty then voted ten to one to "expel" her from the Program. By a vote of ten to one abstention, the faculty decided that plaintiff's contract for the year 1983–1984 would not be renewed but she would be allowed to continue her third year on probation. In this manner, if further incidents of misconduct arose, she would be dismissed immediately, but at the same time she was given an opportunity to look for another residency program. She was informed of the staff's decision and the events leading to that decision were also explained as well as her right to seek reconsideration in ninety days.

On October 22, 1982 plaintiff requested reconsideration and a hearing before the faculty to express the reasons why she understood the July 1982 decision was erroneous. The request was granted and she was afforded a hearing on December 2, 1982. On that date, she requested an extension of ninety days to present her reconsideration. This request was denied and she proceeded to present her case before the faculty. This consisted of reading a proposal, copies of which she handed to the faculty. In this proposal she stated that

the charges against her were prompted by a handful of residents who were openly hostile to her but that the situation had changed noticeably since these residents were no longer in the Program. She stated in general terms that the charges against her were false and exaggerated. She was then asked questions by the faculty and the two letters of June 1982 were again read. Plaintiff argued that those charges were false, that they were part of a general plot to malign her character. She then attributed the hostility to Dr. Robert Novoa, a staff member present at the hearing. Dr. Novoa asked that he be excused from the meeting so that plaintiff could express herself more freely, and left the meeting. She then stated that even before she arrived at the Program, Dr. Novoa had made derogatory remarks about her, based his position on his antagonism of some of her friends and had fostered the atmosphere against her. After she was excused, the faculty by a vote of ten to two and three abstentions decided to uphold its previous decision. It should be noted that Dr. Zenaida Méndez was present at every one of these meetings since she was the Chief Resident at the time.

Plaintiff was notified of the decision and of her right to appeal the decision to the special committee. She so requested it, sometime in January 1983. On or about February 1983, while she was pursuing her special appeal, further complaints on her performance were brought before the faculty by co-residents Drs. Morales, Otero, Puccio and Más. Dr. González-Inclán investigated the complaints and found that they were not serious enough to warrant her immediate separation from the Program, pending the special appeal, but that they did reveal the same type of challenge to authority and manipulation for her own benefit which had contributed to the decision not to let her continue in the Program after her third year. The special committee was eventually formed. Its members were Dr. Pedro J. Santiago-Borrero, the Dean of the School of Medicine, Dr. Angel Espinosa, Director of the Office of Gradu-

ate Medical Education; Dr. González-Inclán, Chief, Department of Surgery; Dr. Manuel Más, representative of the residents' committee and Dr. Efraín Rodríguez-Vigil, representative of the Secretary of Health. Dr. Más was elected by the residents to represent them in the committee at a special meeting called by Dr. Espinosa since there was no president of the residents' committee at the time. The special committee notified plaintiff and set the case for hearing. She was advised of her right to counsel and of her right to present evidence or information she deemed appropriate.

Plaintiff appeared before the committee on April 26, 1983. She immediately requested that she be allowed to record the proceedings in her tape recorder. The committee denied this request but allowed her to record her statements, if she so desired. She then proceeded to challenge the presence of Dr. Manuel Más, as member of the special committee, because he was not the president of the Interns and Residents Committee, as was required by the internal regulations, and this position did not exist at the moment. Dr. Santiago-Borrero explained that he requested from the residents that they elect a representative and that they had elected Dr. Más. The committee examined the election, and finding no evidence of any irregularities in the selection process, approved the presence of Dr. Más as representative of the residents. Plaintiff then read from a fifteen point, three page document explaining her position. She referred to the June 1982 complaints as false and groundless. She questioned Dr. Cuevas' allegations that she lied to him regarding the admission of patients. She stated that she had requested the opportunity to discuss this with Dr. Cuevas to confront him with his charges in front of the faculty but this was denied. Plaintiff argued that a resident does not have to consult with a senior resident on every admission of a patient and that it was common practice among the residents to admit more patients to one's ward in order

to perform more work and gain more experience that, in her case, she was singled out and the charges exaggerated. She invited the committee members to examine medical records that would reveal her punctuality, attendance and assignment of patients. The rest of her allegations were of a general nature regarding the hostility against her by the small group of residents who had decided to get rid of her and had prompted all these incidents. Plaintiff was then questioned by the committee. She was asked whether she now had any problems with the residents, to which she replied that she had no problem with the residents, except for two or three. She was questioned on her abandonment of duty. She denied any such abandonment giving a series of explanations. Dr. González-Inclán's referred to specific instances, including those discussed before and more recent ones as well, to her failure to follow the Program's line of authority and to her constant desire to do things her own way. Plaintiff indicated that the committee would benefit if faculty members were interviewed regarding her evaluations and performance. Plaintiff did not introduce any evidence to support her contentions. After the question and answer session ended, plaintiff was excused, and, upon examining plaintiff's record, the special committee considered her situation to be that of a resident who had been informed of deficiencies in her work, had been oriented and placed on probation, but her performance had not improved sufficiently nor consistently during her second year. At the end of her second year, negative evaluations arrived late, and the Evaluation and Promotion Committee did not have them when they decided to promote her to third year. Once received, her case was re-evaluated and it was decided that she would be separated from the Program at the end of her third year. After this first meeting, the special committee members met with members of the faculty on April 28, 1983 and with residents on May 5, 1983 to obtain information regarding plaintiff's allegations. All the faculty members present, except for one who had abstained in the original vote, agreed that plaintiff had to be separated from the Program because of her disdain of authority. Likewise, the residents interviewed at a meeting where twenty-two out of thirty-six Program residents were present complained of plaintiff's attitude and behavior. Two female residents present at the meeting stated that they had not noticed any sexual harassment or discrimination in the Program and agreed that plaintiff's conduct created friction among residents. The twenty-two residents ratified their support for Dr. Más as their representative. The committee met again on May 13, 1983, discussed the case and unanimously decided not to reverse the faculty's decision. Among their conclusions, stated in a document entitled Response to Appeal by Surgery Faculty's Decision which answers each one of plaintiff's fifteen-point appeal, the committee found that the faculty's decision was based on her overall performance as resident and that, even though she had received good grades in the In-Training Test similar to those received by other residents, this was but a fraction of the evaluation process. The committee found no evidence of harassment or discrimination because of sex or medical school previously attended.[17] It found that the evidence presented did not reveal a pattern of hostility against her by a small group of residents but rather problems between her and the majority of the faculty and residents. The committee notified plaintiff of its decision, indicating that the faculty had acted according to the Surgery Regulations and that her contract was not violated since it did not contain any provision assuring continuity for more than one year.

■ In determining whether the process afforded by the U.P.R. officials passes constitutional muster, it is fundamental to understand that "the very nature of due process negates any concept of inflexible procedures universally applicable to every

---

17. Plaintiff had also alleged that she was being treated differently because she came from the Caribbean School of Medicine in Cayey and not from the U.P.R. School of Medicine.

imaginable situation." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). As indicated in *Lassiter v. Department of Soc. Serv. of Durham Cty.*, 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–59, 68 L.Ed.2d 640 (1981), "applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Id.* The essence of due process is that the party about to suffer the loss of a constitutionally protected interest be given an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951); *Sullivan v. Carignan*, 733 F.2d 8, 9 (1st Cir.1984). The Supreme Court has repeatedly stated that in the academic setting the requirements of constitutional due process may be satisfied by something less than a trial-like proceeding. *Bd. of Curators of University of Mo. v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Goss v. López*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Recently, in *Regents of the University of Michigan v. Ewing*, — U.S. —, 106 S.Ct. 507, 88 L.Ed.2d 523, the Court sustained the principle that when "judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment" *id.* at —, 106 S.Ct. at 513. This discretion afforded to academic decisions, added to the court's responsibility to safeguard the academic freedom of educational institutions—a special concern of the First Amendment, *id.* at n. 12,—gives these institutions wide latitude in evaluating the performance of their students. *Horowitz*, 435 U.S. at 88, 98 S.Ct. at 954. In *Horowitz*, a case also dealing with the evaluation of a medical student in a surgery residency program, the Court was careful to point out that the wide flexibility allowed the institution, which in that case did not afford Horowitz a formal hearing to rebut charges of incompetence, may not be afforded in a situation where a student was faced with disciplinary charges stemming from valid rules of conduct rather than with an evaluation of his/her academic fitness, *id.* at 86, 98 S.Ct. at 953. Of course, the fact that the proceedings may involve disciplinary charges does not automatically require total adherence to the judicial model of decision making. *Henson v. Honor Committee of U. Va.*, 719 F.2d 69, 75 (4th Cir.1983). Even in "strict" discipline proceedings, the educational institution has not been required to include all the trial-type components of due process to its proceedings. *See Horowitz*, 435 U.S. at 89, 98 S.Ct. at 954–55; *Goss v. López*, 419 U.S. 565, 576–78, 95 S.Ct. 729, 737–38, 42 L.Ed.2d 725. Again, there is no fixed set of requirements and strict disciplinary type proceedings, which can result in the expulsion or dismissal of a student, require only that the process contain "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion" from the educational institution, *id.* at 581, 95 S.Ct. at 740. The Court in *Goss* stopped short of requiring that the disciplinary process in the educational setting contain all the trial-type rights, but only that the student be given adequate notice of the charges and an informal hearing where the student may present his version of the facts.

*Goss* involves the strict discipline-type proceeding which sometimes is not clearly distinguishable from the "academic" type proceeding involved in *Horowitz* and *Ewing*. In fact, even in *Horowitz*, although the court deemed the evaluation an academic one, it was not based entirely on purely objective data, such as test scores which are usually associated with "academic" type decisions, but it also drew from factors that depended on the subjective impressions of faculty members with whom Horowitz worked during her rotations. *See Horowitz*, 435 U.S. at 91, n. 6, 98 S.Ct. at 955–56

n. 6. There may be situations where academic fitness requries evaluation of subjective character traits for these may also be valid components of the characteristics of a certain trade or profession and their evaluation necessary to determine "academic" fitness for that type of profession. *Cf. Corso v. Creighton University*, 731 F.2d 529, 532 (8th Cir.1984) (medical student expelled for cheating on test considered an academic offense not requiring procedures outlined for disciplinary offenses because the operative facts were premised on an academic matter). *Schlein v. Milford Hospital*, 423 F.Supp. 541, 544 (D.Conn.1976), *aff'd Schlein v. Milford Hospital, Inc.*, 561 F.2d 427 (2nd Cir.1977) (reasonable to evaluate personal qualities of physician, such as ability to work well with others, since this relates to doctors' performance in hospital setting).

In the present case, the Program's Acting Director, Dr. González-Inclán, indicated that one of the essential flaws in plaintiff's performance, her inability to follow the Program's line of authority and her desire to do things her own way, was a deficiency in terms of the Program's idea of what a good surgeon should be. According to Dr. González-Inclán, a good surgeon should not adopt whatever judgment first comes to mind and then stick to it steadfastly but should constantly criticize and review the initial judgment made to determine if the correct action was taken. This constant re-evaluation process is presumably developed by making the residents consult with their superiors when dealing with patients rather than by acting unilaterally according to what they believe is the right approach. This "character" requirement, part of several personality-type items included in the quarterly evaluation form [18] on which all residents are evaluated, can be considered an academic factor of the make-up of surgeons' judgmental skills that the Program teaches to its residents. In this sense,

plaintiff's shortcomings are more akin to inability to fulfill an academic element necessary for the training of a surgeon, than to the breach of a rule of conduct.

In addition, a critical factor in any due process analysis involves recognizing the interests that motivate the action taken and that determine whether the action taken—the procedures used—are sufficient to protect and balance these interests. In terms of plaintiff's alleged protected interest, it should be noted that, although Program regulations indicated and Dr. González-Inclán expressed that, generally speaking, when a resident is promoted to third year level the chances of completing the surgery residency are practically assured since most of the weeding out occurs during the first two years, plaintiff was certainly not a typical third-year resident. Conditions had been placed upon her by defendants for her third year residency after receiving complaints brought against her during her probationary period. It was understood, and she had been so notified, that she would be allowed to continue her third year and to complete it *if* no other complaints were made and that, in any event, she would not be promoted after completion of that third year nor allowed to continue in the Program thereafter. This "promotion" to third year, really a gratuitous accommodation afforded to her by the faculty so that she would have a year to search for another residency, was not the usual third year promotion entitling a resident to rest on the expectancy of completion of the residency. It was a conditional promotion, similar to the also conditional second half of her second year, and any expectations that she may have legitimately harbored, were also conditioned to that same extent. Therefore, whatever property interest plaintiff had in completing her surgery residency, *see Ewing*, at ——–——, 106 S.Ct. at 511–12; *Stevens v. Hunt*, 646 F.2d 1168,

**18.** Examples of the subjective traits that the Program deems necessary for the training of a surgeon are: "general appearance," "emotional maturity," "cooperation with personnel," "rapport with patients," "acceptance of work," "adaptation to rules of institution," "reliability," "interest in work," "ability to work alone" and "desire to learn."

1169 (6th Cir.1981), or liberty interest[19] in pursuing a medical career, *see Horowitz,* 435 U.S. at 84, 98 S.Ct. at 952, it was not a totally unqualified interest giving rise to the absolute expectations plaintiff has claimed. *Cf. Harrington v. United States,* 673 F.2d 7, 10 (1st Cir.1982); *Longarzo v. Anker,* 578 F.2d 469, 471 (2nd Cir.1978) (probationary employee held to have no property interest in continued employment).

 It must also be remembered that plaintiff's protected interest is but one of the factors which must be balanced in determining the required process; the other factors being "the risk of an erroneous deprivation of an interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards, and ... the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement will entail." *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Besides the particular leeway afforded to academic institutions and the academic factors involved in plaintiff's faulty performance, the public hospital setting in which this situation unfolds also presents additional, special governmental interests. Aside from the usual interest of administrative efficiency chorused by government agencies, a public hospital has a considerable interest in protecting patients from incompetent physicians or from those unable to work effectively in the collegial interdependency of a hospital setting. *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 368 (9th Cir.1976); *Kaplan v. Carney,* 404 F.Supp. 161 (E.D.Mo.1975). With these fundamental guidelines in mind, we now examine the specific components of plaintiff's due process claim.

 Plaintiff alleges that she was not given adequate notice because the members of the special committee interviewed residents and faculty members who complained of other incidents, unrelated to the November 1981 or January-May 1982 complaints, and the committee probably considered these additional charges in the evaluation of her case. Notice is an indispensable element of due process but it can take a variety of constitutionally acceptable forms, depending on the circumstances and the accommodation of the competing interests involved. *Mathews v. Eldridge,* 424 U.S. at 334, 96 S.Ct. at 902; *Goss v. López,* 419 U.S. at 579, 95 S.Ct. at 738-39; *Mullane v. Central Hanover Bank & Trust Co.,* 399 U.S. 306, 314-15, 70 S.Ct. 652, 657-58, 94 L.Ed. 865 (1950). The essential inquiry is whether the information provided is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* With respect to the notifications and information provided to plaintiff throughout proceedings that extended themselves from November 1981 to April 1983, we conclude that she was given adequate notice of the matters under investigation. The claim that the special committee examined other incidents related to her performance disregards the fact that, when the case reached the special appeals committee, a decision had already been made on charges which plaintiff had been adequately notified of and as to which she had been given ample opportunity to present evi-

---

**19.** In *Horowitz,* the Court declined to hold whether the interest involved in the pursuit of a medical career was a liberty, or a property interest for it found that the procedure afforded by the educational institution was sufficient. We believe the same holds true for the present case. However, it is pertinent to note that plaintiff's separation from the program was not of the stigmatizing variety with which liberty interests are generally associated. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Liberty interests are generally found to exist when the action involves serious and specific charges which might substantially damage standing and association in the community. When the charges deal with incompetence, inability to deal with co-workers in a professional manner or improper job performance, the interest involved is more of the property type. *Ventetuolo v. Burke,* 596 F.2d 476, 484, n. 13 (1st Cir.1979).

dence.[20] The special appeals committee was not making an initial determination regarding her performance. It was merely inquiring whether her past performance, upon which a decision to separate had already been taken, was in any way different from the current perception of her performance. It was plaintiff who made reference to the fact that she did not have problems with the rest of the residents or faculty and it was plaintiff who invited the committee to interview the faculty on the matter of her performance. Given this self-serving description of the situation, which was unsupported by testimony or statements from other residents or faculty, and plaintiff's own invitation to the committee, the interviews conducted by committee members during the faculty and residents' meetings were not improper. The nature of the inquiry did not go beyond the scope of the primary concern: her inability to fit into the Program's authoritarian system, a concern manifested to her since the original incidents occurred. In fact, this had been noted as early as 1980. Her second quarterly (Oct.-Dec.1980) evaluation report indicated: "[t]he only problem so far has been her subtle resistance to doing things she does not like. She tries to manipulate the people around her to get what she wants." The November 1981 incident, the incidents raised by the residents in their letter of December 1981 and those complained of during her period of probation, touched upon this attitude and she was so informed. Female resident Dr. Zenaida Méndez confirmed the presence of this same trait which was affecting plaintiff's performance, as did, in part, plaintiff herself by her self-perception as an outspoken woman who would not fail to challenge her superior residents' actions if she thought they were acting incorrectly. During her presentation to the special appeals committee she was confronted with recent incidents which Dr. González did not feel were sufficiently serious to warrant her immediate dismissal as some residents requested, but which he felt also revealed this habit of challenging the Program's structure of command and she was so told. Between this initial hearing and the committee's final meeting more than two weeks had elapsed. Given these circumstances shown by the record to be devoid of genuine issues, the notices provided by defendant U.P.R. officials were sufficient to apprise her of the charges being considered and to give her adequate time to prepare an explanation to them. Whether she took advantage of the notice provided to prepare a defense supported by objective data or not is of no concern to this analysis.

■ With respect to the alleged due process violation in the use of the Program's internal procedural rules rather than those provided by the U.P.R. general student regulations,[21] it should first be noted that at no time during the entire proceedings or afterwards did plaintiff request that her case be channeled through the general regulations procedure rather than through the Program's rules. There is also no indication in the record that plaintiff was prevented by the U.P.R. officials from either requesting during the proceedings that the matter be determined according to the general regulations instead of by the Program's method or that proceedings under the general regulations be initiated after the committee had rendered the decision and the Program's special proceedings

20. No immediate adverse action was taken on the November 1981 incident. The matter was investigated and then she was placed on probation. Likewise, as to the June 1982 complaints, the faculty notified her of the complaints, gave her an opportunity to present her case, investigated and then decided. A full six months elapsed and she was afforded an opportunity, on reconsideration, to present her case. The lapse of time between notice and decision as to those incidents was more than sufficient to enable her to prepare a defense.

21. "Reglamento General de Estudiantes de la Universidad de Puerto Rico," approved March 30, 1968, revised January 29, 1982. Plaintiff indicates that these regulations provide for the right to an administrative hearing with counsel, record, opportunity to cross-examine witnesses, further appeals to the Council on Higher Education and ultimately the Superior Court of Puerto Rico.

had culminated. Given this absence, it would be speculative to conclude that the U.P.R. officials deprived plaintiff of her rights under the general regulations by proceeding under the Program's internal rules when plaintiff herself followed the Program's internal procedures and never demanded that the general regulations be applied and when the U.P.R. officials never indicated that plaintiff was precluded from resorting to these general regulations. In fact, it could be argued that the absence in the record on this matter could well support the conclusion that since there existed alternate remedies, which she did not seek or utilize, due process was not denied. *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir.), *cert. denied* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982). It is also necessary to recognize that the Program, and plaintiff's position therein, is far removed from the typical university student situation and presents several atypical factors that make it a sui generis type of educational setting, partly unsuitable for the strict application of the U.P.R. student regulations. The U.P.R. regulations themselves provide that other U.P.R. educational units like the Program which could arguably fall under the general regulations [22] may have their own regulations to supplement the general ones. Part. V Art. 17, General Regulations. In particular, the quasi-employment context of the Program where the residents are placed, not only in a learning position as typical "students" for which the General Regulations were clearly intended, but also in a position in which they are already graduated doctors rendering compensable services affecting the lives of patients,[23] the yearly promotion system of progress through the Program whereby a resident would get credit and certification for the years of residency completed as well as for completion of the entire residency, make application of the general regula-

tions cumbersome. A reading of the contents of the U.P.R. General Regulations also reveals that it may have been designed for other types of situations in very different settings than the one now before us. None of the acts described by these general regulations as undisciplinary conduct appear sufficiently related to the type of behavior for which plaintiff was sanctioned. The regulations refer to the type of serious misconduct that may be encountered in an educational setting, for example: altering grades, cheating on tests, breach of peace, interruption of classes, unruly demonstrations, vandalism, obscene acts, aggression, etc. The essential problem with plaintiff's performance during her residency was her inability to follow the Program's lines of authority. As we indicated previously, this deficiency is not strictly an academic one in the sense that it may be measured by written tests, but it is a constantly evaluated trait which the Program considers necessary to develop in the training of a surgeon. Given these particularities, it may be possible that the general regulations were not designed to deal with situations such as the present one. In any event, it is unnecessary to determine this issue, for the failure to follow these set of regulations, even assuming they had to substitute the specific ones provided by the Programs, is not a violation of federal law.

In *United States v. Cáceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) the Court indicated that the mere fact that an agency violates its own rules does not create a due process violation. Only if an independent constitutional violation occurred, if selective enforcement can be shown or if there was substantial reliance on the agency regulation involved is there a due process violation. *Id.* As we indicated previously, the record does not support plaintiff's conclusory allegations of

---

**22.** Part 1 of the general regulations indicates that the regulations are applicable to U.P.R. educational units.

**23.** It could be argued that the yearly contract with the School of Medicine creates an employ-

ment relationship rather than a student-teacher one. We need not rule on this issue which may have other implications since we find that the failure to use the General Regulations was not a violation of due process.

selective enforcement and it appears that she did not rely on the general regulations but rather on the Program's internal rules. The record also fails to show that the procedure used by the U.P.R. officials was constitutionally deficient. Although Dr. Rivé-Mora participated in the December 1982 decision to deny her reconsideration, he did not participate in the previous decision, there is no evidence that she challenged his presence at that faculty meeting. The presence of Dr. Novoa at these meetings and of Dr. Más at the special appeals committee was challenged by plaintiff and the challenge was adequately examined.[24] Furthermore, there is no evidence, which could have easily come from Dr. Zenaida Méndez since she was present at these meetings, that anything other than what was recorded in the minutes occurred so as to give any weight to plaintiff's allegations that these individuals tainted the procedure because they "swayed" the vote by convincing those present. All of the adverse decisions taken against plaintiff by the faculty and committee were either unanimous or by a clear majority. There is no support for the contention that the presence of these individuals deprived plaintiff of an unbiased evaluation by the majority of the presumably unbiased faculty members. *See Withrow v. Larkin*, 421 U.S. 35, 56, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975). Her contention that the failure to afford her an opportunity to cross-examine her accusers violated federal due process is equally groundless. As we indicated before, educational administrative proceedings, even in the disciplinary context, do not have to afford the student all trial-type due process guarantees. *Goss v. López*, 419 U.S. at 583, 95 S.Ct. at 740–41. The right to cross-examine, although important, is not absolute. *Beauchamp v. De Abadia*, 779 F.2d 773, 776 (1st Cir.1985). In *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir.1976) a resident in pathology questioned the constitutionality of the procedure used by the defendant

Hospital in evaluating his performance and ending his residency on grounds that it failed to afford him an adversarial type hearing with an opportunity to cross-examine those who had charged him with deficiencies in his residency which included "an unwillingness or inability to deal with his coworkers in a professional manner." *Id.* at 366. The court's comments on why a procedure which afforded a resident notice of his deficiencies, an opportunity to examine the evidence against him and to present his side of the story did not present a probable "risk of an erroneous deprivation," despite the fact that no cross-examination rights were afforded, are particularly relevant to our case. The court there stated:

> With respect to the evaluations of his competence, it is improbable that an adversary procedure would enable a resident to undermine well-formulated opinions against him. Even so, the more important, and perhaps decisive, factor is the perceived inability of Stretten to cooperate effectively with his colleagues. The collective opinion that a resident is excessively abrasive would destroy the proper operation of a collegial, functionally-integrated group. The decision-maker may give great weight to the group's opinion on this point. Significantly, this perception is not easily shaken by cross-examination. The procedural implications of these considerations is that a full adversary hearing is unlikely to be more useful than less elaborate procedures in revealing any flaws that would undermine the case against a terminated resident.

*Id.* at 368–69 (footnotes omitted). In the present case, plaintiff was afforded adequate notice on several occasions and she had more than sufficient time to prepare her defense throughout the more than sixteen months during which her performance was being tested at different levels. The procedure used by the faculty and the spe-

---

**24.** Dr. Más' challenge had nothing to do with the fact that he had brought prior charges which

Dr. González-Inclán dismissed.

cial committee was adequate, under the circumstances, to investigate the case. Plaintiff has no absolute right to cross-examination and resort to such procedures would not have added much to the committee's evaluation given the scope, setting and limits of their investigation. As in *Stretten,* failure to use cross-examination or more adversary-type proceedings did not increase the risk of an erroneous deprivation and had no real probable value in view of the matters being evaluated, the expertise involved, and the governmental interests at stake, namely, that of protecting the hospital patients' welfare and assuring that the surgeons trained by the state are the most competent to serve the community. *See also Ong v. Tovey,* 552 F.2d 305 (9th Cir.1977), *Sanders v. Ajir,* 555 F.Supp. 240 (W.D.Wis.1983).

▌ Finally, plaintiff again resorts to her broad challenge to the U.P.R. officials' state of mind. She contends that these defendants' cultural sexist attitude prevented them from reaching a fair decision on her case. As we indicated in our discussion of the Title IX and section 1983 sex discrimination and harassment aspect of her claim, this conclusory allegation is not supported by the factual contents of the record. Plaintiff asks us to go beyond the universe of reasonable inferences and weave from matters, such as the fact that Dr. Blanco suggested that she see a psychiatrist after she informed him of her overdose incident or that the faculty are mostly male surgeons, a cognizable judicial controversy on these defendants' state of mind. The record is insufficient to establish genuine controversy on this aspect of plaintiff's claim for even when the facts and reasonable inferences taken therefrom are viewed in the light most favorable to her, she fails to establish that the administration's collective decision was the result of any unconstitutional motivations on the part of U.P.R. officials. In short, there is nothing in the factual framework of this case to support the contention that there are genuine issues on whether these defendants afforded plaintiff a fundamentally fair procedure under the particular circumstances of this case as required by the Due Process Clause. After having been afforded for almost three years the full fanfare of pretrial litigation and discovery, plaintiff has still been unable to present a judicially cognizable factual framework for her claim against the U.P.R. officials. Although Rule 56 should not be misused to deprive litigants of their "day in court," we would be shunning our responsibilities and ignoring the public policy behind the mandate of Rule 56 if, upon such an absence of genuine issues on material facts, we allowed speculative issues and subjected these public officials to the disruptive effects of an unnecessary trial. Expanding on plaintiff's quotation from *Mack v. Cape Elizabeth School Board,* 553 F.2d at 722, it is one thing is to dot the "i's" and cross the "t's," and quite another to piece together an assortment of disarrayed events and conclusory allegations.

Defendant U.P.R. officials' motions for summary judgment are hereby GRANTED. The liability of codefendant University of Puerto Rico being dependent on these officials' liability, our conclusion as to these officials is equally applicable to defendant U.P.R. and this codefendant's motion for summary judgment is also GRANTED. The U.P.R.'s motion to dismiss of July 10, 1985 is DENIED as MOOT. There being no basis for the exercise of this court's federal jurisdiction over these defendants, the pendent state law claims against them will not be entertained. The complaint against defendants U.P.R., Norman Maldonado, Pedro J. Santiago-Borrero, Gumersindo Blanco and José R. González-Inclán is hereby DISMISSED. Partial Judgment shall be entered accordingly.

The Court will rule on remaining federal defendants' motion for discovery and other matters, see note 5, shortly hereafter.

SO ORDERED.