896 F.Supp. 1506 (1995)
Robert SIBLERUD, Plaintiff,
v.
COLORADO STATE BOARD OF AGRICULTURE; Dean Jaros, individually and as Dean of the Graduate School, Colorado State University; A.J. Linck, individually; Rupert P. Amann, individually and as Chair of Colorado State University's Physiology Department, Defendants.
Civ. A. No. 93-K-516.
United States District Court, D. Colorado.
August 14, 1995.
*1507 *1508 Barry Satlow, Boulder, CO, for plaintiff.
Simon Lipstein, Assistant Attorney General, Denver, CO, for defendant.

AMENDED MEMORANDUM OPINION AND ORDER
KANE, Senior District Judge.
Plaintiff Robert Siblerud initiated this 42 U.S.C. § 1983 action on March 3, 1993, asserting his dismissal from the graduate program at Colorado State University (CSU) was unlawful. He seeks damages, declaratory and injunctive relief, and attorney fees. In the only remaining claims,[1] Siblerud contends the actions of CSU and various members of its faculty and governing board violated his rights under the First and Fourteenth Amendments of the United States Constitution.
Both Siblerud and the CSU Defendants move for summary judgment. The Defendants also assert the claims against Rupert Amann (Physiology Department Head), Dean Jaros (Dean of the Graduate School), and A.J. Linck (Provost and Academic Vice President) in their individual capacities should be dismissed under the doctrine of qualified immunity. Finally, they argue the statute of limitations bars Siblerud's claims.
I grant CSU's motion for summary judgment because I conclude Siblerud's claims are time-barred. In an effort to put this matter to rest and to stave off similar controversies before they find their way into court, I comment extensively on the merits of the parties' claims.

I. Background

Siblerud first enrolled as a graduate student at CSU in 1983. At the time of the events in question, he was no longer enrolled because he had completed his coursework in the Spring semester of 1988. CSU scheduled him to defend his dissertation in April of that term, but the defense was canceled because two committee members, Drs. James Masken and Winslow Caughy, determined Siblerud had to do more research or "benchwork." This was Siblerud's academic situation when Amann took over as the Head of the Physiology Department on March 15, 1989.
During the semester he became Department Head, Amann informed Siblerud he needed to add three members of the Physiology faculty to his graduate committee. (Letter from Amann to Siblerud of 04/20/89 & Amann Mem. of 05/04/89, Defs.' Ex. 1, Attachs. 2 and 3.) Amann also told Siblerud that one of those faculty members had to serve as Siblerud's graduate advisor. Vacancies had been created on the existing committee because Siblerud's advisor, Dr. David Robertshaw, had left for Cornell University and resigned his position with CSU, as did Physiology department faculty members Masken and Caughy. Robertshaw resigned because he felt the distance was too great an obstacle to continue as an advisor. The file contains no explanation for either Masken or Caughy's resignation.
By the Fall semester of 1989, Siblerud had not yet reestablished a graduate committee. As a result, Amann notified Siblerud on September *1509 22, 1989 that he had been placed on academic probation for failing to make satisfactory progress towards his graduate degree. The probationary period was to last through the 1990 Spring semester. If Siblerud still did not have a graduate committee and advisor by then, he would be dismissed. This event never occurred, however, because Amann dismissed Siblerud from the graduate program on April 11, 1990 for other reasons.
In December 1989, Amann had learned that Siblerud had submitted a paper titled, "The Relationship Between Mercury Amalgam and Health" to the Journal of Environmental Pathology, Toxicology, and Oncology (JEPTO) in the spring of 1987. The cover page of the paper contained a footnote that read, "Based on a Ph.D. dissertation in process in the Department of Physiology at Colorado State University." (Defs.' Ex. 1, Attach. 12.) Amann discovered this footnote after Dr. George H. Scherr, an editor of JEPTO, contacted him.
Although Siblerud submitted the paper to JEPTO in 1987, JEPTO did not agree to publish it until the end of 1989. Siblerud thus had no correspondence with JEPTO for over two years. When JEPTO contacted Siblerud in 1989 with a letter seeking his copyright release, Siblerud refused. This refusal precipitated Scherr's letter to Amann which contained the various communications between Siblerud and Scherr. Presumably, Scherr sent the letter to express his dissatisfaction with Siblerud's lack of cooperation.[2]
Following his correspondence with Scherr, Amann wrote Siblerud on December 28, 1989. Amann ordered, "Until further notice, you will not represent yourself as a student of the Department of Physiology or utilize resources of the Department of Physiology including stationery, mailing privileges, or other privileges given an active graduate student." (Defs.' Ex. 1, Attach. 14.) Amann also told Siblerud that because he was not actively enrolled, he had to reapply for admission which would include a $30.00 fee.[3] Amann since has testified that he also provided Siblerud a copy of the footnote and copies of his correspondence with Scherr. Siblerud allegedly violated this directive when, on February 7, 1990, he submitted an article of the same title to the journal of Fundamental and Applied Toxicology (FAT) which contained a substantively identical footnote.[4]
Amann learned of the second submission on April 10, 1990 from Dean Craig Schnell, an editor of FAT. Siblerud made this submission over one month after Amann's directive. Amann also learned that both the article and Siblerud's research had been criticized by reviewers at FAT. One day after this communication with Schnell, Amann summarily dismissed Siblerud from CSU's graduate program.
Amann notified Siblerud of his dismissal by letter dated April 11, 1990. As grounds for the dismissal, Amann explained Siblerud had disobeyed his earlier directive. Amann stated the University could potentially suffer irreparable damage if Siblerud continued to represent himself as a student in the Department of Physiology or to submit manuscripts implying that the content was consistent with the University's standards. (Letter from Amann to Siblerud of 04/11/90, Pl.'s Ex. 5.) Finally, Amann told Siblerud that he could appeal the decision through the Graduate *1510 School's grievance procedures. Amann attached a copy of those procedures.
Siblerud availed himself of the grievance process. At the first level of appeal, Dean Jaros upheld Siblerud's dismissal. Next, Siblerud appealed to a formal review committee which consisted of four members. Siblerud selected one faculty member, Dean Jaros selected one faculty member, the Dean of the College selected one faculty member, and the Graduate Student Council selected one student. The committee addressed the issue of whether Amann followed the proper procedures in dismissing Siblerud. The result was a 2-2 split. The committee reported its contradicting conclusions to Dean Jaros who, after considering them, decided to uphold the dismissal. Finally, Siblerud appealed his dismissal to the Provost and Academic Vice President, A.J. Linck. Linck upheld the decision and notified Siblerud by letter dated March 4, 1991. (Defs.' Ex. 4, Attach. 8.)
At each stage of the grievance process, Jaros offered Siblerud the opportunity to submit whatever documentation he chose. Also, Linck met informally with Siblerud before handing down his decision. Siblerud contends these procedures were inadequate and maintains he should have been afforded a pre-dismissal hearing.

II. Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The Tenth Circuit has stated: "To be a `genuine' factual dispute, there must be more than a mere scintilla of evidence. To avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative." Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir.1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250-51, 106 S.Ct. 2505, 2510, 2511-12, 91 L.Ed.2d 202 (1986)).

III. Statute of Limitations

Defendants contend Siblerud's claims are time-barred under Colorado's two-year residual statute of limitations. Because they first raised the issue in their reply brief, however, Siblerud had no opportunity to address it. I therefore scheduled oral argument on the parties' motions and specifically requested the parties address the question of whether Siblerud's claims were time-barred. Asked at oral argument whether he wished to file a supplemental brief on this issue, Siblerud declined.

A. Merits
Colorado's two-year residual statute of limitations, C.R.S. § 13-80-102(1)(i) applies to claims brought under 42 U.S.C. § 1983. Blake v. Dickason, 997 F.2d 749, 750 (10th Cir.1993).[5] The question presented here is when did Siblerud's claims accrue. While state law determines the limitations period applicable to a § 1983 claim, federal law determines when the cause of action accrued. Baker v. Board of Regents, 991 F.2d 628, 632 (10th Cir.1993). Under federal law, "[a] civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." Baker at 632.
In Baker, the University of Kansas Medical School (KUMS) rejected plaintiff's application. KUMS notified plaintiff of this decision by letter dated January 29, 1986 and on February 12, 1986, plaintiff met with the Associate Dean of KUMS who informed him *1511 that his rejection was the result of a poor interview. Plaintiff sued two years later claiming reverse discrimination under 42 U.S.C. §§ 1981 and 2000d. The trial court held plaintiff's suit was time-barred and the Tenth Circuit affirmed.
The Tenth Circuit agreed plaintiff's cause of action accrued in early February when KUMS failed to admit him. Id. at 632. Plaintiff's argument that he did not know certain facts until much later was rejected because "it is not necessary that a claimant know all of the evidence ultimately relied on for the cause of action to accrue." Id.[6] Applying these principles to Siblerud's case, I hold the statute of limitations bars his claims because more than two years elapsed between the time CSU dismissed him and the date he filed his complaint.
CSU argues there are two possible dates that could represent the day Siblerud's dismissal was final. The first possibility is March 4, 1991, the day Provost Linck upheld the dismissal and Siblerud exhausted the grievance process. The second is April 11, 1990, the date of Amann's dismissal letter.[7]
CSU contends if Siblerud argues his dismissal occurred in 1991, then he admits CSU afforded him notice and a hearing. The 1991 dismissal letter would represent notice of the charges and the grievance procedures would signify several pre-termination hearings. Conversely, CSU claims if Siblerud argues CSU dismissed him in 1990, then the statute of limitations should bar his claim. I agree; Siblerud cannot argue both ways. There are three reasons for holding that mid-April, 1990 was the date of Siblerud's dismissal.
First, the stated purpose of Amann's dismissal letter was "to inform [Siblerud] that [he had] been dismissed from the Graduate Program of the Department of Physiology, effective April 11, 1990." (Letter from Amann to Siblerud of 4/11/90, Pl.'s Ex. 5.) In closing, Amann stated Siblerud could appeal the decision through CSU's established grievance procedures. I find this letter clear and absolute; Amann expelled Siblerud. Second, in his briefs, Siblerud repeatedly refers to that date as the day when Amann dismissed him. See Pl.'s Br.Mot.Summ.J. at 3, 4, 9, 20, 27, 28; Pl.'s Resp.Defs.' Mot. Summ.J. at 10; Pl.'s Reply Mot.Summ.J. at 9, 13, 17; Siblerud Aff. ¶ 12, Pl.'s Ex. 10; but see Defs.' Ex. 15 and Siblerud Dep. at 282 (Siblerud claims CSU dismissed him on March 4, 1991).
Finally, the Supreme Court has stated in the context of wrongful dismissal claims, "[t]he grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made." Delaware State College v. Ricks, 449 U.S. 250, 261, 101 S.Ct. 498, 506, 66 L.Ed.2d 431 (1980);[8]See also Kessler v. Board of Regents, 738 F.2d 751, 754 (6th Cir.1984) ("[w]hen allegations of discrimination involve a termination from employment, the critical date is the date of termination; the existence of a grievance procedure does not change the importance of this date"). I therefore conclude Siblerud's cause of action accrued in mid-April 1990, the date of his dismissal.
I recognize this is a harsh ruling. Holding that Siblerud's wrongful dismissal suit is time-barred signals to potential litigants they should sue first and seek non-legal alternatives later. There is dicta in Ricks to support Siblerud's contention that the statute of limitations should not bar his claims in this action. There, the Court recognized that "limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." 449 U.S. at 262 n. 16, 101 S.Ct. at 506 n. 16. But the Court also made clear it did not mean to "suggest that aspirants for academic tenure should ignore available opportunities to request reconsideration. Mere requests to reconsider, however, cannot extend the limitations periods applicable *1512 to civil rights laws." Id. at 261 n. 15, 101 S.Ct. at 506 n. 15.
Moreover, the record indicates Siblerud sought the advice of counsel as early as December 24, 1990. In a letter appealing Dean Jaros' decision, for example, Siblerud wrote: "According to my attorney, I legally won this stage of the grievance because there was not a major[ity] vote to sustain Dr. Amann's decision." (Letter from Siblerud to Linck dated 12/24/90, Defs.' Ex. 4, Attach. 2 (referring to the grievance committee's 2-2 split).) Another example occurred when Siblerud notified CSU of his intent to sue on August 30, 1991. In his letter, Siblerud indicated he was aware the law required him to submit such notice. (Defs.' Ex. 15.) Thus, between September 1991 and April 1992, Siblerud had ample opportunity to file his claims.

B. Equitable Tolling
At oral argument on the statute of limitations issue, Siblerud asserted the doctrine of equitable tolling should shield his claims. He has not submitted supportive evidence.
The tolling of § 1983 actions is governed by state law. Board of Regents v. Tomanio, 446 U.S. 478, 485-86, 100 S.Ct. 1790, 1795-96, 64 L.Ed.2d 440 (1980); Baker v. Board of Regents of State of Kansas, 991 F.2d 628, 632-33 (10th Cir.1993) (holding "[t]he length of a statute of limitations period and related questions of tolling and application are governed by state law, unless the tolling rules are inconsistent with federal law or with the policy which federal law seeks to implement"). Equity will toll the statute of limitations if Siblerud proves CSU "prevented him ... from filing a timely claim." Samples-Ehrlich v. Simon, 876 P.2d 108, 110 (Colo.App.1994). Siblerud, however, has not established any grounds for equitable tolling to apply, and the facts support CSU.
CSU dismissed Siblerud on April 11, 1990. See supra part III.A. By letter dated March 4, 1991, Provost Linck notified Siblerud he upheld his dismissal; thus, the grievance process ended. Because Siblerud still had over one year to file his claim, assertions that CSU prevented him from doing so are unfounded.

IV. Fourteenth Amendment Claim

Siblerud asserts his dismissal violated his rights to procedural due process under the Fourteenth Amendment of the U.S. Constitution. To prove this claim, Siblerud must demonstrate that his dismissal from CSU deprived him of a property or liberty interest. Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, 82, 98 S.Ct. 948, 951, 55 L.Ed.2d 124 (1978). Maintaining CSU deprived him of both, Siblerud argues his dismissal was disciplinary and not academic,[9] CSU did not provide any disciplinary process or appeal hearing, and CSU did not follow its own rules in dismissing him. Siblerud's due process arguments have merit, but they are barred by the applicable two-year statute of limitations. Even so, I will discuss them in order to provide guidance to this institutional defendant.

A. Property Interest
Property interests are created by state law. Board of Regents v. Roth, 408 U.S. 564, 576, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In Goss v. Lopez the Supreme Court, construing Ohio public education statutes, stated that "[h]ere, on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education."[10] 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975). The Tenth Circuit has found "no difficulty in concluding that in light of Goss, supra, where the Supreme Court recognized a property right in public school students that certainly such a right must be recognized to have vested with [plaintiff], and the more prominently so in that she paid a specific, separate fee for enrollment and attendance at the Gordon Cooper School." Gaspar v. Bruton, 513 F.2d 843, 850 (1975).[11] Thus, *1513 I would hold that Siblerud had a property interest in attending CSU.[12]

B. The Dismissal: Academic or Disciplinary?
To determine whether CSU provided Siblerud with adequate procedural safeguards before depriving him of his property interest, one must first decide whether CSU dismissed him for academic or disciplinary reasons.[13] CSU contends the dismissal was academic; Siblerud argues it was disciplinary. Because CSU's evidence is merely colorable, I find no reasonable juror could return a verdict for CSU on this issue.
Siblerud uses two of CSU's internal memoranda to prove the dismissal was disciplinary. The first one is a summary of a meeting that had occurred on February 7, 1991 among Linck, Amann, Jaros, and other CSU staff. Phil Omi, assistant to Provost Linck, wrote the memo in which he commented, "(Note: Academic dishonesty was not at issue in the dismissal)." (Pl.'s Ex. 25 ¶ 2.) Dean Jaros sent the second memo on August 19, 1991 to Linck. Jaros wrote:
I think this case could have been handled entirely as one of academic performance. You will recall my specific advice that it be so treated from the beginning. It is unfortunate that one of the principals in the case felt it necessary to reject my advice. While his raw exercise of authority may have been personally satisfying, it was not in the interest of the University or even in the long run interests of this principal himself.
... It is difficult to know how to respond, since my preference had always been for the "lack of satisfactory academic progress" argument, one which as you point out has been congenial to the courts. Recall that I initially sustained the Department Head's decision on such grounds.
I can easily justify all of what has happened on the basis of the "satisfactory progress" argument and I can write that down. But the letter of dismissal specifically invokes the "raw authority" argument. How can we back off of it at this point? My best attempt is a diffuse reply to Siblerud as attached.
(Pl.'s Ex. 26.) This is strong evidence and CSU's attempts to parry the blow fail.
None of the cases cited by CSU supports its claim that Siblerud's dismissal was for academic reasons. In Pflepsen v. University of Osteopathic Medicine, 519 N.W.2d 390 (Iowa 1994), for example, a fourth-year podiatry student was dismissed for two reasons which the court deemed were academic. Pflepsen at 392. First, the plaintiff had scrubbed and incised a patient's toe after the supervising doctor had left the room and instructed the students not to start without *1514 him. Second, he had removed a postoperative bandage from a patient's foot which, again, was contrary to the supervising doctor's instructions. Id. The Iowa Supreme Court stated that "[p]ractical aspects of professional training and discipline, especially in the health sciences, are a part of the student's academic training." Id. at 392.[14] Amann's discipline of Siblerud was not related to Siblerud's treatment of patients or any other practical training a physiology doctoral candidate might undergo. Similarly, CSU's reliance on Corso v. Creighton University, 731 F.2d 529 (8th Cir.1984), and Lipsett v. University of Puerto Rico, 637 F.Supp. 789 (D.P.R.1986), is misplaced.
In Corso, the defendant dismissed plaintiff for lying and cheating. The court stated the dismissal was "academic-related," but held plaintiffs contractual rights entitled him to a hearing based on the university's student handbook. Corso at 533. The defendant in Lipsett dismissed a surgery resident. The court stated:
The essential problem with plaintiff's performance during her residency was her inability to follow the Program's lines of authority. As we indicated previously, this deficiency is not strictly an academic one in the sense that it may be measured by written tests, but it is a constantly evaluated trait which the Program considers necessary to develop in the training of a surgeon.
Lipsett at 811.[15]
Applying this case law to Siblerud's claim, CSU contends, "The ability to comply with reasonable requirements regarding the submission for publication of manuscripts is a valid component of the characteristics of a research scientist." (Defs.' Br.Mot.Summ.J. at 12.) In addition, CSU asserts a scientist's research must conform with the techniques and standards used by other scientists in the area.[16] Finally, after Siblerud failed to obey his order not to represent himself as a graduate student at CSU, Amann purportedly based his decision to dismiss on his evaluation that Siblerud failed to exemplify the necessary characteristics of a research scientist.[17]
Weighing the arguments of each side, I find Siblerud's more persuasive. There are four factors leading me to this conclusion. First, CSU's contemporaneously kept internal memoranda suggest its arguments here are afterthoughts based on recent Supreme Court opinions deferring to a university's academic evaluations in dismissing its students. Second, CSU poorly interpreted and misquoted case law to support its arguments. Third, CSU's proposition that Amann evaluated Siblerud's ability as a research scientist lacks credibility considering the dismissal occurred within 24 hours after Amann learned of the second submission to FAT. Finally, a stronger argument favoring Siblerud arises from the same cases cited by CSU. In Horowitz, for example, Chief Justice Rehnquist stated:
Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative *1515 factfinding proceedings to which we have traditionally attached a fullhearing requirement.... The requirement of a hearing, where the student could present his side of the factual issue, could under such circumstances "provide a meaningful hedge against erroneous action."
Horowitz at 89 (quoting from Goss, 419 U.S. at 583, 95 S.Ct. at 741). Siblerud's "evaluation" here, with its letters, warnings, and subsequent grievance proceedings, looks, walks and quacks like a disciplinary determination.

C. The Propriety of Siblerud's Dismissal
Neither side disputes the procedures CSU offered and Siblerud followed; however, Siblerud contests whether Amann had the authority to dismiss Siblerud and whether the procedures were adequate under the Fourteenth Amendment.

1. Did Amann Have the Authority to Dismiss Siblerud?
Both sides present lengthy arguments as to whether Amann had the authority to dismiss Siblerud. They cite agency law and contest whether courts should defer to an agency's interpretation of its own rules. Whether Amann, as the Department Head, had the inherent authority to dismiss a student in his department is unclear.
CSU asserts Amann had the authority as the Physiology Department Head to dismiss Siblerud. CSU relies on § C.2.6.2. of the 1989-90 Academic Faculty and Administrative Staff Manual which provides:
C.2.6.2 Department Heads: The department head is the administrative and academic officer in the department and is the initial person in the administrative chain to the President. Members of the department staff are responsible to him/her. The department head has the general responsibility for any staff activities which may affect the professional status of the department or the best interests of the University.
(Defs.' Ex. 1, Attach. 23.) CSU argues Amann considered "all persons associated with the Department of Physiology to be staff as the word is used in § C.2.6.2 because any of these persons could affect, benefit or harm the University through their activities." (Defs.' Br. at 8.)[18]
The parties rely on the agency law cases of Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991), and Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) to support their respective positions. The arguments made, however, are not on point. Here, there is no administrative agency interpreting statutes or rules created by Congress. Instead, this case involves a university interpreting a section of its own manual to provide the basis of a department head's authority to dismiss one of his students.
When Siblerud questioned Amann's authority through the grievance process, CSU repeatedly confirmed Amann's authority vested in him under § C.2.6.2. CSU continues to argue the point. Whether § C.2.6.2 delegated Amann the authority to dismiss Siblerud is conjectural at best and a flimsy reed on which to support the assertion.
The more persuasive argument is that CSU has inherent authority to discipline its students, see infra note 28, and Amann properly exercised it in these particular circumstances. There are two critical facts that support this position. CSU had already placed Siblerud on probation and he did not have a graduate committee that could have taken the appropriate action.

2. Were the Procedures Adequate?
Claiming CSU's procedures did not comport with the Fourteenth Amendment, Siblerud contends CSU did not provide notice of the charges after he violated the directive nor an opportunity to be heard.
In Goss v. Lopez, supra, the Supreme Court stated, "`The fundamental requisite of due process of law is the opportunity to be *1516 heard,' (quoting Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914)), a right that `has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to ... contest." 419 U.S. at 579, 95 S.Ct. at 738 (quoting from Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)) (alteration in original). Because Siblerud's dismissal was disciplinary and not academic, Siblerud argues CSU was required to give him notice and an opportunity to be heard. I agree.
In Mathews v. Eldridge, the Supreme Court enunciated three guidelines for determining the "specific dictates" of due process:[19]
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
424 U.S. 319, 325, 96 S.Ct. 893, 898, 47 L.Ed.2d 18 (1976).[20]
Applying the Mathews balancing analysis, I find the procedures CSU employed were not sufficient. Siblerud faced expulsion; therefore, his private interest was exceptionally robust. Conversely, the state's interest was to protect its reputation such that it may have had to act quickly to avoid any further harm had Siblerud continued to submit articles. The procedures employed did not involve a pre-termination hearing. This hearing would not have been too cumbersome and could have avoided this dispute. While I have no opinion on whether CSU's decision was erroneous, a pre-termination hearing would have provided more safeguards against any erroneous decision than the grievance procedures that CSU offered. Finally, because I do not think CSU faced a situation where it had to make a decision within twenty-four hours lest its reputation might have crumbled, I would hold CSU did not provide adequate due process.[21]
CSU maintains its procedures were adequate. Employing the rejected contention that Siblerud's dismissal was academic, CSU argues Amann's decision was "independently reviewed by three different entities who reached the same essential conclusions." Then, in a questionable choice of phrases, CSU exclaims, "It is beyond cavil to say that CSU's decision to dismiss Plaintiff was arbitrary nor [sic] capricious." (Defs.' Br. at 15.)
Even if the dismissal were disciplinary, however, CSU argues it afforded Siblerud adequate due process. CSU focuses on two sets of facts to support this conclusion. First, CSU reiterates Siblerud's unstable academic standing. Siblerud had neither applied nor paid the fee for continued admission *1517 for the Spring semester of 1990;[22] he was an inactive student because he had not enrolled in any classes since the Spring semester of 1989;[23] he was on probation for lack of satisfactory academic progress; he did not reestablish the required graduate committee; and he did not have an advisor.[24]
Second, CSU highlights the procedures it did provide. CSU gave Siblerud notice of the decision to dismiss him, the basis for that decision, and his right to appeal; Siblerud appealed the decision to Dean Jaros who affirmed; Jaros advised Siblerud of his decision and of Siblerud's right to appeal; Siblerud appealed to a committee and selected one member to sit on the committee; Siblerud had the opportunity to present a written statement and any documentation to the committee; the committee split evenly on the decision and provided its bipolar recommendation to Jaros who affirmed again; Jaros informed Siblerud of the decision, the basis for it, and Siblerud's right to appeal; Siblerud appealed to Provost Linck who afforded Siblerud the opportunity to submit a written statement and any documentation; Linck met with Siblerud to discuss his case; and finally, Linck upheld the decision to dismiss Siblerud.[25] In closing, CSU notes Siblerud participated in each step of the process and never asserted he was entitled to any alternative process.[26] CSU's arguments, however, fail to justify the inadequate procedures it provided Siblerud. Dean Jaros' second memo of August 19, 1991 to Linck, discussed supra part IV.B, provides poignant support.

V. First Amendment Claim

A. Merits
The question presented by Siblerud's First Amendment claim is whether a graduate school violates a student's free speech rights by dismissing him for stating his article is based on a "dissertation in process" after the school had directed him not to represent himself as a graduate student. The issue, as presented by this case, is analogous to that of a state employer dismissing an employee for exercising certain speech and thus requires one to balance the two actors' competing interests. See Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Wulf v. City of Wichita, 883 F.2d 842 (10th Cir.1989); Koch v. City of Hutchinson, 847 F.2d 1436 (10th Cir.1988).
"The `threshold question' in determining whether an adverse employment decision violates the employee's First Amendment rights is whether the speech at issue is on a matter of `public concern.'" Wulf at 856 (quoting Rankin at 384 and Koch at 1440). If it is, then the court balances the state actor's interest in regulating the speech against the plaintiff's interest in speaking freely. Id. The speech to which CSU objected was a footnote on the cover of Siblerud's manuscript which read, "Based on a Ph.D. dissertation in process in the Department *1518 of Physiology at Colorado State University." The purpose of this footnote is unclear, but I suspect that on the surface, it made Siblerud's article more credible and attractive to publishers. Nonetheless, I cannot ascertain how this footnote or what it states is a matter of "public concern." "Speech on matters of public concern has been defined as speech `fairly considered as relating to any matter of political, social, or other concern to the community.'" Wulf at 857 (quoting from Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983)). Here, Siblerud has made no attempt to show how the content of his footnote is a matter of public concern.
Even if Siblerud's footnote were a matter of public concern, I suggest CSU's interest in prohibiting such speech in this particular case outweighs Siblerud's interest in stating his affiliation. CSU has an interest in ensuring the work its students disseminate to the public reflects the quality and standards consistent with its program. That interest is especially implicated when a probationary student who has no graduate committee or advisor with whom he can consult is the one attempting to publish his work. By comparison, Siblerud's interest is less strong. His interest in this case does not involve the right to publish his articles because CSU, in its directive, did not prohibit Siblerud from submitting articles to journals. Instead, CSU merely denied Siblerud the right to represent himself as a graduate student. Thus, Siblerud's interest is the right to state his affiliation which, although tenuous, did exist.
Balancing CSU's and Siblerud's interest under Pickering and its progeny, I would hold Siblerud's interest fails. "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the ... [student's] expression are relevant, as is the context in which the dispute arose." Koch at 1449 (discussing employee speech and citing Rankin, 483 U.S. at 388, 107 S.Ct. at 2899). Siblerud submitted the disputed footnote after he was told not to represent his affiliation with CSU and after he had been placed on probation for failing to establish a new graduate committee. Moreover, Amann's letter directing Siblerud to cease from representing such an affiliation included a copy of the original footnote, thereby providing Siblerud with notice as to the forbidden language. Thus, Siblerud knew exactly which incident had created Amann's concern and should have been more attentive to the wording of the footnote in his second article.

B. Siblerud's Motion for Summary Judgment
Siblerud relies on the following syllogism to support his cross-motion for summary judgment on the First Amendment claim: (1) a university may not prohibit its students from exercising their First Amendment free speech rights; (2) CSU dismissed Siblerud for stating an affiliation with it; (3) stating an affiliation with one's university is protected speech; (4) therefore, in dismissing Siblerud, CSU violated the First Amendment. Because Siblerud's premise that stating an affiliation with one's university is protected speech is unfounded, I find the argument flowing from that premise unpersuasive as a matter of law.
Siblerud supports his premise with a line of cases stating "students do not `shed their constitutional rights to freedom of speech at the schoolhouse gate.'" (Pl.'s Br. at 6 (quoting Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) and citing Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).) Without exception, these cases involve expressions of opinions, beliefs, or values.[27] Siblerud's footnotes contain no such expressions.
*1519 Siblerud contends the footnotes were accurate because his dissertation was actually "in process" and although it had not been defended, it did exist. He argues "dismissing him because he truthfully claimed an affiliation with CSU is a content-based restriction that does not serve a significant government interest and is prohibited by the First Amendment." (Pl.'s Br. at 12.) Siblerud cites Aumiller v. University of Delaware, 434 F.Supp. 1273 (D.Del.1977) arguing that under Aumiller, identification of a speaker with his university position was protected speech. Siblerud, however, misstates the case.
In Aumiller, the University of Delaware hired plaintiff to manage the University Theater. Aumiller's contract was not renewed because he had allegedly advocated homosexuality in three newspaper articles. The University felt that Aumiller had used his position "to foster and promote what most Americans and Delawareans consider an aberrant lifestyle." Aumiller at 1287. Thus, the University did not dismiss Aumiller simply for stating his affiliation with the University but for allegedly using his affiliation to express his protected opinions and values about homosexuality. Moreover, Aumiller's statements did not violate any university rule. The court stated that the University did not prohibit faculty members from using their official titles as a form of public identification. Aumiller at 1296.
In addition to not involving any suppression of ideas, this case can be distinguished from Aumiller because CSU specifically told Siblerud he was not to represent himself as a graduate student. Siblerud may challenge the appropriateness of this rule, but there are two reasons which suggest CSU's prohibition was not unjust. First, Siblerud was not in good academic standing. Second, the Tenth Circuit has recognized that "[a] university has of course the inherent right to discipline students." Slaughter v. Brigham Young University, 514 F.2d 622, 626 (10th Cir.1975).[28] The letter that promulgated the ban on Siblerud's representations appears to have been a temporary, disciplinary measure CSU adopted to prevent Siblerud from submitting articles that could embarrass its academic reputation. See supra part I. This fear was justified under the circumstances because Siblerud did not have a graduate committee to preview his articles.
Siblerud's remaining arguments are also unpersuasive. First Siblerud contends the footnote was harmless, merely giving the reader information on the article's origin. He misses the point. The footnote did more than provide identification; it implied Siblerud had conducted his research under the auspices of CSU and thus had its approval. It ignores the fact CSU did not allow him to defend his dissertation because two members of his graduate committee found he needed to do more research.
Next Siblerud argues CSU did not have any rule requiring students, before attempting to publish their work, to submit articles for faculty review or prohibiting them from identifying their relationship to the university in their articles.[29] Even though I do not see the relevance of this argument to his First Amendment claim, I note proper academic customs and procedures included such a review. Furthermore, CSU did create a rule for Siblerud prohibiting him from making any representations until CSU gave him further notice.
Siblerud also analogizes that CSU could not regulate the content of articles published by its alumni or prevent graduates from identifying themselves even though such a publication could affect CSU's reputation. Like his other arguments, this one is flawed *1520 in that it assumes his speech was protected and CSU regulated the content of his article.[30]
Finally, Siblerud argues the regulation of his footnote, even if justified, was unreasonable because it lacked "narrow specificity." (Pl.'s Br. at 16 (quoting N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).) The actual quote from Button reads, "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." Button at 433. As Siblerud's First Amendment claim does not involve legislative rules or regulations of speech, Button is inapposite.[31]

VI. Qualified Immunity

In Harlow v. Fitzgerald, the Supreme Court stated, "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); see also Laidley v. McClain, 914 F.2d 1386, 1394 (10th Cir. 1990). Subsequently, the Supreme Court stated a court should not inquire into the existence of clearly settled law at too high a level of generality. Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The "proper approach," according to one noted commentator, is "to ask whether the right allegedly violated [is] clearly settled in a more particularized and fact-specific sense." Sheldon H. Nahmod, Civil Rights and Liberties Litigation: The Law of Section 1983, 122-23 (3rd ed. 1991) (citing Anderson, 483 U.S. at 639-41, 107 S.Ct. at 3038-40). Thus, in order for Siblerud to overcome the immunity defense of Amann, Jaros, and Linck, he must prove not only that they violated civil rights law in dismissing him but also that the laws violated were "clearly established" at the time.
"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992).[32] "To overcome the defense, the plaintiff must do more than identify a clearly established legal test and then allege that the defendant has violated it. The plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir.1990). CSU argues Siblerud failed to meet this burden. I agree.
Quoting Harlow, Siblerud argues that "if the law was [sic] clearly established, the immunity defense should fail, since a reasonably competent public official should know the law governing his conduct." 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396. He then conclusorily asserts, "The weight of authority from the Supreme Court and lower federal courts is that defendants' actions clearly violated Siblerud's First Amendment right to free speech." (Pl.'s Resp. at 25.) Furthermore, Siblerud claims, "The law at the time Siblerud was dismissed by Amann clearly provided that dismissals *1521 for disciplinary reasons must be accompanied by notice and an opportunity to be heard." (Id. at 26 (citing Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725).) These conclusions do not have substantive support.
Due to my earlier conclusion that Siblerud's speech was not protected, see supra part V (arguing his speech did not express any idea, opinion, or belief), I find the law supporting CSU's liability for prohibiting it was not clearly established. Even if the First Amendment protected Siblerud's speech, I would still hold the law was not clearly established. The Tenth Circuit has stated:
"Harlow is intended as a shield against liability but cannot become an insuperable barrier; therefore, public officials lose immunity in the face of clearly established law. However, because a rule of law determined by a balancing of interests is inevitably difficult to clearly anticipate, it follows that where Pickering balancing is required, the law is less likely to be well established than in other cases."
Melton v. City of Oklahoma City, 879 F.2d 706, 729 (10th Cir.1989). Similarly, I find the courts have not established the law surrounding Siblerud's Fourteenth Amendment claim.[33]
The Supreme Court has stated that "[a]t the very minimum ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." Goss at 579, 95 S.Ct. at 738. Considering the ambiguity of this guideline, I do not think the law was as clearly settled as Siblerud contends. This point is particularly strong here where the student was on probation and disobeyed a directive. While I have observed CSU's procedural safeguards were inadequate, I cannot conclude it did not afford Siblerud some kind of hearing and some kind of notice. I would therefore have granted CSU summary judgment to the extent it sought the dismissal of claims against Defendants Amann, Jaros, and Linck on immunity grounds.

VII. Conclusion

While I comment extensively on the merits of Siblerud's claims and the issues raised in the parties' cross-motions for summary judgment, my ruling is confined to the statute of limitations issue mentioned by CSU in its reply in support of its motion for summary judgment and addressed by the parties at oral argument. I find Siblerud's claims accrued when he received Amann's letter dismissing him from CSU's graduate program in April 1990 and reject, under Ricks, the contention that the limitations period was tolled during the ensuing grievance process. According to the record, Siblerud was represented by counsel during at least part of this process, yet waited until March 3, 1993, nearly one year after the limitations period had run, to file his complaint.[34] I conclude Siblerud's claims are barred as a matter of law under C.R.S. § 13-80-102(1)(i). Accordingly,
Defendants' Motion for Summary Judgment is GRANTED and IT IS ORDERED that judgment enter in favor of defendants *1522 and against plaintiff on plaintiffs remaining claims for relief in this action.
NOTES
[1] By order dated January 14, 1994, I dismissed Siblerud's pendent state law claims on sovereign immunity grounds, citing Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 117-121, 104 S.Ct. 900, 917-920, 79 L.Ed.2d 67 (1984) (holding unless a state has expressly waived its sovereign immunity to suit in federal court, the Eleventh Amendment prevents federal courts from exercising supplemental jurisdiction over state law claims of a citizen against a state or its officials, whether the claims are for damages or injunctive relief).
[2] Siblerud's relationship with Scherr and JEPTO is puzzling. There is no explanation in the record for why Scherr waited over two years before agreeing to publish nor why he communicated to Amann his annoyance with Siblerud.
[3] Siblerud's readmission application was denied because there was no faculty member able or willing to serve as his advisor.
[4] According to the Defendants' briefs, the first footnote read, "Based on a Ph.D. dissertation in process in the Department of Physiology at Colorado State University." (Def.'s Ex. 1, attach. 12.) At oral argument and in his briefs, Siblerud claimed it stated, "based upon a dissertation submitted to the Graduate Faculty at Colorado State University." (Pl.'s Br.Mot.Summ.J. at 2.)

The file is unclear on this matter because it contains a copy of only one footnote. This dispute, however, is not critical because Siblerud and CSU acknowledge that it read substantively the same as the original footnote. That Siblerud claims he attempted to comply with Amann's directive by changing the footnote from "dissertation submitted" to "dissertation in process," (Siblerud Aff. ¶ 20), bolsters my analysis on the inadequacy of CSU's procedures. See discussion infra part IV.C.2.
[5] The Supreme Court held that because Congress did not enact a statute of limitations expressly applicable to § 1983 claims, 42 U.S.C. § 1988 requires federal courts to adopt the most analogous limitations period provided by the state law. Board of Regents v. Tomanio, 446 U.S. 478, 483-484, 100 S.Ct. 1790, 1794-1795, 64 L.Ed.2d 440 (1980).

In Wilson v. Garcia, the Court held a state's personal injury statute applies to all § 1983 claims. 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Furthermore, where a state has multiple statute of limitations for personal injuries, the residual or general personal injury statute of limitations applies, not the one for intentional torts. Owens v. Okure, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). See David W. Lee, Defending 42 U.S.C. § 1983 Actions 153-54 (5th ed. 1994).
[6] The Plaintiff had argued he did not know he had the highest cumulative GPA/MCAT (3.63/625 respectively) scores of any non-admitted Kansas resident until December 1, 1987.
[7] The actual date should be the day Siblerud received the letter.
[8] Although Ricks involved a professor claiming the University of Delaware discriminated against him when it denied him tenure, I use this quote to demonstrate the Supreme Court's view on the time of accrual for wrongful dismissal claims.
[9] This distinction is relevant for determining how closely a court should examine the adequacy of a university's procedures. See discussion infra part IV.B.
[10] Ohio Rev.Code Ann. §§ 3313.48 and 3313.64 directed local authorities to provide a free education to all residents. Goss at 573, 95 S.Ct. at 735.
[11] See also Harris v. Blake, 798 F.2d 419 (10th Cir.1986) for the proposition that, "Colorado has created the basis for a similar claim of entitlement to an education in its state college system.... The legislature has directed that these colleges `shall be open ... to all persons resident in this state' upon payment of a reasonable tuition fee." Blake at 422 (quoting from Colo.Rev.Stat. § 23-50-109 (1973)) (alteration in original).
[12] Defendants attempt to distinguish Siblerud's entitlement from those of the plaintiffs in Harris and Gaspar. They argue the plaintiff in Gaspar attended a public vocational school that differs from CSU because it is not a university with highly competitive admission requirements. They also assert Harris involved the University of Northern Colorado, which by statute is an open enrollment university (Colo.Rev.Stat. § 23-50-109 (1994 Supp.)). Claiming Siblerud had no property interest, the defendants state he had failed to pay the tuition and admission fee which would have secured his claim of entitlement.

Although the defendants are correct with respect to Siblerud's status, I think Siblerud would prevail on this issue. Siblerud states he had enrolled in 1983 and completed all of the required coursework such that he needed no more classroom or formal study for the degree. To obtain his Ph.D., Siblerud needed to complete his research and writing which he was doing when CSU dismissed him. Finally, Siblerud notes Amann had stated a student need not be an active one (enrolled) to be a candidate for a Ph.D. if he is working on his dissertation.
[13] In Board of Curators of University of Missouri v. Horowitz the Supreme Court, after noting due process is a flexible concept, stated, "The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978).
[14] CSU omitted "especially in the health sciences" and substituted an ellipses. This reliance on Pflepsen is disingenuous.
[15] Again, CSU's argument is misleading because its citation is incorrect. CSU stated, "[T]he decision to dismiss a medical student for failure to follow instructions and the student's inability to control her desire to `do things her own way' was an academic decision. (Defs.' Br.Mot.Summ.J. at 11 (quoting from Lipsett at 811).)
[16] CSU states a graduate must submit manuscripts for faculty review before attempting to publish them. This review will ensure the research meets the appropriate standards. Demonstrating it adopted this "criteria," CSU points to page 33 of the CSU Bulletin which states:

The graduate student and the student's adviser have the right and responsibility to seek appropriate and timely dissemination of significant research results through publication, oral presentation, or other appropriate means. Such dissemination including particular requirements of the project and its sponsors should be discussed by the graduate student, the adviser and any others involved including the graduate advisory committee during the conduct of the research.
(Defs.' Ex. 5.)
[17] CSU makes one other post hoc, ergo propter hoc argument that is particularly weak. CSU proposes its provision to Siblerud of an "academic appeals procedure" after his dismissal further proves its argument that the dismissal was academic. (Defs.' Br. at 13.)
[18] Siblerud did not receive any compensation from CSU. He was not a research or a teaching assistant.
[19] While Mathews involved a governmental agency and not a state university, I think it is useful simply for the balancing analysis.
[20] Neither side has discussed how Mathews' balancing would affect the due process standards. (Siblerud only mentioned its standards). Professor Van Alstyne provides a powerful and possibly exaggerated argument favoring Siblerud. He states:

Where the disciplinary proceeding could result in expulsion or indefinite suspension, the harm to the student in terms of terminating his education and foreclosing professional opportunities may well rival the harm in criminal proceedings. Even where the penalty might not be so severe in itself, the social stigma attached to certain types of misconduct may warrant substantial protection in the decision-making process, quite aside from the penalty which may be imposed.
Procedural Due Process and State University Students, Van Alstyne, 10 UCLA L.Rev. 368.
[21] There are secondary sources supporting this contention. One example is the General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education. It stated, "Three minimal requirements apply in cases of severe discipline growing out of fundamental conceptions of fairness implicit in procedural due process." 45 F.R.D. 133, 147 (1969). The Order suggested the university should (1) give adequate notice; (2) provide a hearing where the student could provide the disciplinary authority with explanations and evidence; and (3) take no action that is not supported by substantial evidence. Id.
[22] This statement is misleading in that Siblerud did file the form; he only failed to include the $30.00 fee. (Defs.' Ex. 1, Attach. 17.)
[23] This statement is also misleading because Amann recognized a graduate student could still be eligible for a Ph.D. even though the student was not active.
[24] Siblerud counters by stating neither enrollment nor payment of a fee was necessary for him to pursue his Ph.D. This contention is only half true. Enrollment was not necessary, but when Amann issued the directive in his letter of December 28, 1989, he also informed Siblerud he had to reapply for admission which included a $30.00 fee. (Pl.'s Ex. 1.)

Siblerud also notes the last three points are closely related because he was on probation primarily for not having a committee or an advisor. Moreover, CSU dismissed him one month before his probation ended. Siblerud declares he expected to have his committee approved by the end of that period.
Finally, Siblerud argues his status is not relevant because CSU dismissed him before his probation ended. This fact "should estop defendants from relying on that deficiency in defining the process to which plaintiff was entitled." (Pl.'s Reply at 10.)
[25] Siblerud challenges his ability to participate in the process. He notes although CSU allowed him to pick one person to be on the committee, the committee's voice was only an advisory one. CSU never allowed him an appearance to present his view, respond to the charges, confront witness and other evidence, or review the record.
[26] Siblerud challenges that, as a lay person, he did not know to what process he was entitled.
[27] The plaintiffs in Tinker were prevented from protesting our involvement in Vietnam, the plaintiffs in Hazelwood were prohibited from printing newspaper articles in the school's paper concerning some students' pregnancies and the impact of divorce on other students, the plaintiffs in Healy were denied the right to form a student political organization while other ones existed, and the plaintiffs in Keyishian had refused to certify that they were not communists. Siblerud does not contend CSU sought to prevent him from publishing his ideas or articles. His complaint is merely that CSU directed him not to state an affiliation  a form of expression the First Amendment purportedly protects.
[28] In Slaughter, a graduate student had been dismissed for submitting articles for publication in which he wrongfully cited a professor as the co-author. Reversing the District Court of Utah, the Tenth Circuit held in favor of BYU. This quote, while dicta, reflects the view of the Tenth Circuit with respect to a university's rules and regulations especially when the rule does not concern First Amendment rights.
[29] Pointing to the its 1989-90 Bulletin, CSU argues its criteria included such a pre-publication requirement. See supra note 16.
[30] Again, Siblerud's footnote exceeded mere identification. Certainly CSU could prevent a graduate from printing an article which said it was based on a dissertation if the graduate had never defended or if CSU had never approved of it. Even if Siblerud had only mentioned he was a graduate student at CSU in his footnote, a university's interest in disciplining those students who have not demonstrated sufficient academic progress should outweigh a student's interest in stating his affiliation when that affiliation is based on a feeble relationship.
[31] Siblerud has one valid complaint concerning the ban. Amann, at the very beginning of this dispute, should have specified the nature of his concern because Amann later admitted there were certain phrases that he would not have opposed. For example, Amann would not have objected had the footnote read, "[F]rom a study being done for a dissertation...." (Amann Dep., 10/14/93 at 41-42.)
[32] Yet, "`precise factual correlation between the then-existing law and the case at-hand is not required.'" Patrick v. Miller, 953 F.2d 1240, 1249 (10th Cir.1992) (quoting from Snell v. Tunnell, 920 F.2d 673, 699 (10th Cir.1990), cert denied, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991)).
[33] Although Melton does not apply to procedural due process claims, these cases also involve a balancing of interests under Mathews v. Eldridge. Thus, one can infer the law in this area is also "inevitably difficult to clearly anticipate."

Siblerud selectively quotes Anderson v. Creighton for the proposition that "`the right of due process of law is quite clearly established by the Due Process clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." (Pl.'s Resp. at 25 (quoting from 483 U.S. at 639, 107 S.Ct. at 3038).) This sentence is taken out of context.
The Supreme Court used this sentence to demonstrate the principles of Harlow should be applied fact specifically and not in a general manner. Two sentences following the one Siblerud quoted, the Supreme Court stated, "But if the test of `clearly established law' were to be applied at this level of generality, it would bear no relationship to the `objective reasonableness' that is the touchstone of Harlow." Anderson at 639, 107 S.Ct. at 3038.
[34] For the sake of clarity, I note the reference to counsel is not to Siblerud's present attorneys, Barry Satlow and Pamela Howell, who first were approached by Siblerud in February 1993. The counsel to which Siblerud referred in his 12/24/90 letter to Linck (discussed at p. 11, supra), has never been identified.